417 F.2d 838
 UNITED STATES of America, by John MITCHELL, Attorney
General, Plaintiff-Appellant, Danita Hampton, by
her Mother and Next Friend, Yvonne
Hampton, et al.,
Plaintiffs-
Intervenors-
Appellants,
v.
CHOCTAW COUNTY BOARD OF EDUCATION et al., Defendant-Appellees.
 No. 27297.
 United States Court of Appeals Fifth Circuit.
 June 26, 1969.
 
 Frankie L. Fields, Vernon Z. Crawford, Vernol R. Jansen, Jr., U.S. Atty., Mobile, Ala., Gary J. Greenberg, Kenneth L. Johnson, Merle W. Loper, Attys., U.S. Dept. of Justice, Civil Rights Div., Washington, D.C., Jack Greenberg, Franklin E. White, Lowell Johnston, New York City, for appellant.
 J. Edward Thornton, Mobile, Ala., John Y. Christopher, Butler, Ala., for appellees.
 Before WISDOM, Circuit Judge, and CARSWELL and ROBERTS, District judges.
 WISDOM, Circuit Judge:
 
 
 1
 This school desegregation case is one of a number of recent cases[1] raising the question whether school boards should resort to zoning and pairing of schools rather than adhere to freedom of choice as prescribed in Jefferson.[2]
 
 
 2
 Some day in the not-far-distant future this Court should be able to say to a school board, 'You have met the standards implicit in the Constitution and explicit in our judicial mandates; go about your business of educating children'. In Jefferson we hoped to accelerate that day by establishing specific but not necessarily inflexible standards that everyone could understand. We based the model decree on three principles:
 
 
 3
 (1) School boards 'have the affirmative duty under the Fourteenth Amendment to bring about an integrated, unitary school system in which there are no Negro schools and no white schools-- just schools'.[3] (2) The dual system must be liquidated 'lock, stock, and barrel'-- students, teachers, staff, faculties, transportation, and school activities.[4] (3) The test is an objective one: 'The only school desegregation plan that meets constitutional standards is one that works';[5] freedom of choice 'is a means to an end'[6] that must yield to other means, unless the end is attained.[7]
 
 
 4
 Jefferson rested on the assumption that school boards would realize that their duty to take affirmative action to dismantle the dual system is not discharged simply by opening the doors of white schools to Negro applicants. The boards' duty is not discharged until all-Negro schools in the system are done away with and faculties are so integrated 'that the pattern of teacher assignment to any particular school (is) not identifiable as tailored for a heavy concentration of either Negro or white pupils in the schools'.[8] Every judge in this circuit knows that the school administrators, almost without exception, have shown good faith and diligence in permitting free transfers. For that reason in many school systems there has been substantial desegregation of white schools. But every judge in this circuit also knows that there has been no progress in any school district toward desegregation of Negro schools.[9] The happy day when courts retire from the business of scrutinizing schools is wholly dependent on school boards' facing up to the necessity of doing away with all-Negro schools and effectively integrating faculties. That is true, no matter whether school boards use freedom of choice, zoning, or a combination of the two plans. Meantime, if freedom of choice, now so stoutly defended by school boards, is not successful, alternatives must be adopted that give promise of working now.
 
 
 5
 Green v. County Board of New Kent County, Virginia, 1968, 391 U.S. 430, 441, 442, 88 S.Ct. 1689, 1696, 20 L.Ed.2d 716, supplies content to the concept of 'workability'.[10]
 
 
 6
 First, the Court noted that the existence of an all-Negro school is, as a matter of law, evidence of the failure of the desegregation plan. Second, statistics indicating that 85 per cent of the Negro children still attend the all-Negro school show that 'the school system remains a dual system.' Third, in determining whether the Board met the 'commands' in Brown,[11] 'it is relevant that the first step did not come until some 11 years after Brown I and 10 years after Brown II directed the making of a 'prompt and reasonable start". Fourth, the Court emphasized that the burden of dismantling the dual system was on the school boards, not the school children and their parents. When a plan is not working, the Board 'must be required to formulate a new plan'. Finally, the Court made two specific suggestions: zoning (where there is no residential segregation) and pairing or consolidation of schools. 'These are two suggestions the District Court should take into account on remand, along with any other proposed alternatives and in light of considerations respecting other aspects of the school system such as the matter of faculty and staff desegregation remanded to the Court by the Court of Appeals.'
 
 
 7
 Shortly after Green was decided, this Court reviewed freedom of choice plans in use in over thirty school systems. Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181. We interpreted Green as holding that:
 
 
 8
 'If in a school district there are still all-Negro schools or only a small fraction of Negroes enrolled in white schools, or no substantial integration of faculties and school activities then, as a matter of law, the existing plan fails to meet constitutional standards as established in Green.' 403 F.2d at 188.
 
 I.
 
 9
 Choctaw County is a small rural county in Alabama. Slightly more than half of the county's 4800 public school pupils are Negroes. Five of its eight public schools are traditionally white, three traditionally Negro.
 
 
 10
 On August 30, 1966, twelve years after the Supreme Court decided Brown I, the United States filed this action to desegregate the Choctaw County public schools. September 15, 1967, the district court entered the Jefferson decree.
 
 
 11
 Not long after the Supreme Court decided Green, the United States and the intervenors[12] filed motions for supplemental relief based on Green. These motions alleged that zoning and pairing of schools would be more likely to achieve a unitary system than a freedom of choice plan, and requested the court to order the School Board to submit a new plan consistent with Green. At the hearing on July 23, 1968, the Superintendent of Schools for Choctaw County testified that Negroes and whites reside in all areas of the county; that Negroes were bussed past white schools and whites bussed past Negro schools.
 
 
 12
 In its opinion order of September 3, 1968, the district court found that in the school year 1967-68 thirteen Negroes attended white schools; no white student attended the traditional Negro schools. Two of the 105 Negro teachers in the school system taught in white schools; none of the 95 white teachers taught in Negro schools.
 
 
 13
 The district court noted that there had been complaints that white students harassed Negroes attending white schools. The court also noted that at the beginning of the 1967-68 school year the Negro community staged a boycott of the schools. The court concluded that for these reasons and also because the School Board has 'not been sufficiently aggressive' in implementing the plan, that the freedom of choice plan, although having 'a great potential" in Choctaw County, 'has not yet worked effectively'. Nevertheless, the district court denied the motions of the United States and of the intervenors. The court said that it was 'inadvisable at this time' to enter any order using the alternatives suggested in Green:
 
 
 14
 'In a rural system such as we have here, which has a division of 48 per cent white and 52 per cent Negro,[13] a zoning or pairing plan which might instantly abolish the dual system, would be accompanied by (1) an emotional wrench, a fact as big as life,[14] and by (2) enormous educational problems which cannot be ignored occasioned by an educational gap which exists between the races.'[15]
 
 
 15
 The district court's denial of the motions for supplemental relief was 'specifically conditioned upon the Choctaw County School Board meeting the following conditions now and not later than the beginning of the second semester of the 1968-69 school year, to wit:
 
 
 16
 '(1) A minimum of 10 per cent of the Negro school population attend traditional white schools in 1968-1969, and plans made now to have not less than 20 per cent in attendance the school year beginning 1969-1970. (2) That in all schools in the county system that a ratio of teachers of the opposite race be not less than 6 of the majority race to 1 of the minority race in a particular school.'
 
 
 17
 The record does not show to what extent the School Board succeeded in meeting these conditions in the 1968-69 school year.
 
 
 18
 A freedom of choice plan is not per se unconstitutional.[16] Nor is a school desegregation plan based on zoning per se constitutional.[17] But it is apparent that in Choctaw County freedom of choice has not 'worked' and as proposed has little chance of working:
 
 
 19
 (1) There are still all-Negro schools; (2) There is still only token student desegregation; (3) There is no faculty desegregation.[18]
 
 
 20
 As a matter of law, there must be student desegregation now, not 10 per cent in 1968-69, 20 per cent in 1969-70, and so on until desegregation eventually is effected. Reiterating its previous reminders that the time for deliberate speed has run out, the Court in Green stated the rule that applies today (391 U.S. at 439, 88 S.Ct. at 1694):
 
 
 21
 The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now.
 
 
 22
 United States v. Bessemer, 5 Cir. 1968, 396 F.2d 44, set a date for compliance with the requirement of adequate faculty desegregation: the first day of the 1970-71 school year. Under the plan approved by the district court, the Choctaw County School Board cannot possibly have faculty integration by 'C-Day'.
 
 II.
 
 23
 We remand the case to the district court with the following instructions:[19]
 
 
 24
 (1) This case shall receive the highest priority.
 
 
 25
 (2) The district court shall require the School Board of Choctaw County to submit a new desegregation plan based on zoning and pairing of schools, as suggested by the Supreme Court in Green.[20] The district court shall enter findings of fact and conclusions of law as to the efficacy of the new plan to disestablish now the vestiges of the dual system. Attendance zones will be drawn to promote desegregation. The plan shall retain those viable elements of the Jefferson decree which are consistent with zoning; for example, the requirement that transportation facilities be desegregated. The district court shall require the School Board to make regular reports to the court to show the effectiveness of its desegregation plan.
 
 
 26
 (3) The plan shall provide for freedom of transfer when the student applies for a transfer from a school where his race is in the majority to a school where his race is in the minority.[21]
 
 
 27
 To avoid resegregation, minority-to-majority transfers should be permitted only in exceptional cases.[22]
 
 
 28
 (4) The plan shall provide for eliminating all-Negro schools by the start of the 1969-70 school term. An all-Negro school, even if desired by the students and their parents, is just as wrong constitutionally, as an all-white school desired by white students and their parents.
 
 
 29
 (5) By September 1970 in each school the pattern of teacher assignment to any particular school should not be identifiable as tailored for a heavy concentration of either Negro or white pupils in the school. As an interim objective, in each school the ratio of teachers of one race to teachers of the opposite race shall be approximately three to one by the start of the 1969-70 school term. Successful desegregation of faculties requires desegregation of principals, substitute teachers, and student teachers.
 
 
 30
 (6) The district court shall forthwith request the Office of Education of the United States Department of Health, Education and Welfare to collaborate with the School Board of Choctaw County in the preparation of a plan to desegregate fully and affirmatively all public schools in the county, with comprehensive recommendations for locating and designating new schools, and consolidating existing schools to assist in eradicating past discrimination and effecting desegregation.[23] The district court shall further require the School Board to make available to the Office of Education or its designees all requested information relating to the operation of the school district.
 
 
 31
 (7) The time schedule for the submission, review and approval of the new plan shall be as follows:
 
 
 32
 (a) The board shall within 30 days of this order develop, in conjunction with the experts of the Office of Health, Education and Welfare, offer an acceptable plan of operation, conformable to the constitutional rights of the Negro students as we have delineated in this opinion. (b) If such plan is agreed upon by the school board and the Office of Education within the time fixed, the Court will approve such plan, unless the plaintiffs within ten days make proper showing that the plan does not meet constitutional standards. (c) If no such agreed plan is developed within 30 days, the Office of Education is requested to submit within 10 days its recommendation of a plan for the school district. (d) The parties shall have ten days from the date a plan is filed with the District Court to file objections or suggested amendments thereto. (e) If the parties object to the plan or suggest amendments, the District Court shall commence hearings beginning not later than ten days after the time for filing objections has expired. (f) A new plan for the district effective for the beginning of the 1969-70 school term shall be completed and approved by the District Court no later than August 15, 1969.
 
 
 33
 Because of the urgency of formulating and approving plans to be effective for the 1969-70 school term it is ordered as follows: The mandate of this court shall issue immediately and will not be stayed pending petitions for rehearing or certiorari. This court will not extend the time for filing petitions for rehearing or briefs in support of or in opposition thereto. Any appeals from orders or decrees of the District Court on remand shall be expedited. The record on any appeal shall be lodged with this court and appellants' brief filed, all within ten days of the date of the order or decree of the district court from which the appeal is taken. Appellee's brief shall be due ten days thereafter. The court will determine the time and place for oral argument if allowed.
 
 III.
 
 34
 The district court entered a Jefferson-type decree on September 15, 1967. The defendants perfected an appeal on September 21, 1967. On May 14, 1968, certain Negro children in Choctaw County and their parents filed a motion to intervene on their own behalf and on behalf of all other Negro children residing in the county. After a hearing, the district court, on June 21, 1968, granted the motion to intervene. The defendants then filed a petition for mandamus in this court to set aside the intervention on the ground that after an appeal of a cause, the district court no longer has jurisdiction to allow an intervention in the district court.
 
 
 35
 This court denied the petition for mandamus, but reserved to the Board the right to raise the issue in other proceedings.
 
 
 36
 School desegregation plans under court order are under continuing review by district courts. In this case, as in many cases, the continuing development of the law requires the district court to retain jurisdiction of the cause even though there may be an appeal from a particular 'final order'. We hold that the district court properly acted within a sound judicial discretion in permitting the intervention in this case after the Board appealed from the entry of the Jefferson decree.
 
 
 37
 We note that in open court the attorneys for the plaintiff-intervenors waived any claim for attorneys' fees.
 
 IV.
 
 38
 Without giving any reasons, the district court taxed costs against the United States to reimburse the defendants for the expense resulting from an unnecessary pre-trial discovery.
 
 
 39
 On July 11, 1968, the defendants moved to take the deposition of some of the plaintiff-intervenors and certain other witnesses. The depositions were taken, as scheduled, over the objection of the plaintiff-intervenors. Counsel for the plaintiff-intervenors objected to some of the questions and instructed the witnesses not to answer.
 
 
 40
 The record is not clear as to what transpired. Counsel for the government state that they attended the depositions but did not participate in any of the examination; that government counsel represented only the United States; that counsel for the government neither instructed the witnesses to answer or not to answer the subject questions.
 
 
 41
 On July 17, 1968, the defendants moved the district court to compel pre-trial discovery relating to those matters about which the witnesses had previously refused to answer questions. The district court ordered the witnesses to answer, and the depositions were taken on August 7, 1968.
 
 
 42
 The defendants, as a basis for claiming costs and attorneys' fees against the plaintiff or its counsel, stated in their motion that the additional costs involved '* * * was the proximate result of the misconduct of counsel for the intervenors, condoned and tacitly approved by counsel for the Department of Justice.'
 
 
 43
 A judgment for costs 'may be awarded to the prevailing party in any civil action brought by or against the United States * * *.' 28 U.S.C. 2412. This statute and Rule 54(d) speak in terms of the 'prevailing party.' Although not a party to the dispute over the depositions the United States was the original party to bring the action.
 
 
 44
 In view of the uncertain state of the record on this issue, we set aside that portion of the order taxing the costs of the depositions to the United States, subject to the right of the defendants to renew their motion to tax costs. We suggest to the district judge that he make findings of fact and conclusions of law as to the liability of the government for costs of the depositions.
 
 
 45
 The judgment in this case is reversed and remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 United States v. Jefferson County Board of Education, 5 Cir. 1969, 417 F.2d 834 (Jefferson III); Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1969, 414 F.2d 69; Hall v. United States, 5 Cir. 1969, 417 F.2d 801
 
 
 [2]
 United States v. Jefferson County Board of Education, 5 Cir. 1966, 372 F.2d 836 (Jefferson I), adopted on rehearing en banc, 1967, 380 F.2d 385 (Jefferson II), cert. denied, 389 U.S. 840, 88 S.Ct. 67, 19 L.Ed.2d 103
 
 
 [3]
 Jefferson II, 380 F.2d at 389
 
 
 [4]
 'Relief to the class requires school boards to desegregate the school from which a transferee comes as well as the school to which he goes. It requires conversion of the dual zones into a single system. Faculties, facilities, and activities as well as student bodies must be integrated.' Jefferson I, 372 F.2d at 868. See also Jefferson II, 380 F.2d at 389
 
 
 [5]
 Jefferson I, 372 F.2d at 847
 
 
 [6]
 Jefferson II, 380 F.2d at 390
 
 
 [7]
 'If school officials in any district should find that their district still has segregated faculties and schools or only token integration, their affirmative duty to take corrective action requires them to try an alternative to a freedom of choice plan, such as a geographic attendance plan, a combination of the two, the Princeton plan, or some other acceptable substitute, perhaps aided by an educational park. Freedom of choice is not a key that opens all doors to equal educational opportunities.' Jefferson I, 372 F.2d at 895-896
 
 
 [8]
 Jefferson II, 380 F.2d at 394
 
 
 [9]
 In Lee v. Macon County Board of Education, M.D.Ala., 1967, 267 F.Supp. 458; 289 F.Supp. 975, involving a number of school systems in Alabama, the district court continues to accept freedom of choice, but has met the problem of the all-Negro school by requiring school boards to close certain schools, to consolidate and pair schools, and to assign a certain percentage of students to the school nearest their home
 
 
 [10]
 Raney v. Board of Education, 1968, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 and Monroe v. Board of Commissioners, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733, 735 are companion cases
 
 
 [11]
 Brown v. Board of Education of Topeka, Shawnee County, Kansas, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (Brown I); 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1003 (Brown II)
 
 
 [12]
 The intervenors are Negro school children and their parents in Choctaw County
 
 
 [13]
 The school district in Green had 57 per cent Negro and 43 per cent white students. In Raney v. Board of Education of the Gould School District, 1968, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727, one of the companion cases to Green, the Negro students constituted 66 per cent of the school population
 
 
 [14]
 This is an impermissible consideration. As the Supreme Court said in Brown II, 349 U.S. at 300, 75 S.Ct., at 756, 'It should go without saying that the vitality of these constitutional principles cannot be allowed to yield simply because of disagreement with them'. See also Monroe v. Board of Commissioners, 1968, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733. There is no reason to believe that the emotional wrench would be greater in Choctaw County, Alabama, than in New Kent County, Virginia (Green) or in Gould, Arkansas (Raney). See footnote 13
 
 
 [15]
 School desegregation cannot be delayed on the ground that Negroes have lower educational levels than whites in the same grades or age groups; that therefore 'compliance with the Supreme Court's decision would be detrimental' to the students. Stell v. Savannah-Chatham County Board of Education, 5 Cir. 1961, 318 F.2d 425, 333 F.2d 55; Jackson Municipal School District v. Evers, 5 Cir. 1966, 357 F.2d 653. The existing effects of past discrimination do not justify perpetuating the unconstitutional conditions which caused the present educational inequalities
 
 
 [16]
 See Green, 391 U.S. at 339, 88 S.Ct. 1689; Jefferson III; Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181; Hall v. St. Helena Parish School Board, 5 Cir. 1969, 417 F.2d 801
 
 
 [17]
 See United States v. Greenwood Separate School District, 5 Cir. 1969, 406 F.2d 1086; Henry v. Clarksdale Municipal Separate School District, 5 Cir. 1969, 409 F.2d 682
 
 
 [18]
 Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181, 188
 
 
 [19]
 These instructions are similar to those expressed in Jefferson III and Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1969, 414 F.2d 69
 
 
 [20]
 Davis v. Board of School Commissioners of Mobile County, 5 Cir. 1968, 393 F.2d 690, 694; United States v. Greenwood Municipal Separate School District, 5 Cir. 1968, 406 F.2d 1086; Henry v. Clarksdale School District, 5 Cir. 1969, 409 F.2d 682
 
 
 [21]
 Adams v. Mathews, 5 Cir. 1968, 403 F.2d 181; Board of Public Instruction of Duval County v. Braxton, 5 Cir. 1968, 402 F.2d 900
 
 
 [22]
 Monroe v. Board of Commissioners of Jackson, Tennessee, 1968, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733; Goss v. Board of Education of City of Knoxville, Tenn., 1963, 373 U.S. 683, 83 S.Ct. 1405, 10 L.Ed.2d 632
 
 
 [23]
 'When desegregation plans do not meet minimum standards, the school authorities should ask HEW for assistance. And district courts should invite HEW to assist by giving advice on raising the levels of the plans and by helping to coordinate a school's promises with the school's performance. In view of the competent assistance HEW may furnish schools, there is a heavy burden on proponents of the argument that their schools cannot meet HEW standards.' Jefferson I, 372 F.2d at 888. Davis v. Mobile quoted the following language from Wittenberg v. Greenville County School District, D.C.S.C.1969, 298 F.Supp. 784: 'The difficulties involved in developing a proper decree concern basically practical operational questions and matters of educational administration. HEW with its staff of trained educational experts 'with their day to day experience with thousands of school systems,' is far better qualified to deal with such operational and administrative problems than the Court presided over by Judges who, as one Court has phrased it, 'do not have sufficient competence-- they are not educators or school administrators-- to know the right questions, much less the right answers."