Pete D. ARVIZU et al., Plaintiffs,

v.

**WACO INDEPENDENT SCHOOL DISTRICT et al., Defendants.**

Patricia Ann BAISEY et al., Plaintiffs-Appellants,

v.

**The BOARD OF TRUSTEES OF the WACO INDEPENDENT SCHOOL DISTRICT et al., Defendants-Appellees.**

No. 73–3080.

United States Court of Appeals, Fifth Circuit.

May 17, 1974.

John W. Walker, Little Rock, Ark., Jack Greenberg, Sylvia Drew, New York City, for plaintiffs-appellants.

Minor L. Helm, Jr., Peeler Williams, Jr., Waco, Tex., for defendants-appellees.

Guadalupe Salinas, Ed Idar, Jr., Jim Heidelberg, John E. Serna, San Antonio, Tex., for Pete D. Arvizu.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

This appeal is taken from a district court order, 373 F.Supp. 1264, adopting the plan proposed by the Board of Trustees of the Waco Independent

School District (WISD) for desegregating the schools of the district. The scrupulous regard for constitutional requirements manifested by both the Board and the district court has largely muted the objection most frequently interposed in litigation concerning remedial decrees in school desegregation cases —namely, that the decree endorses a plan which will not desegregate the entire system. Rather, here, appellants'[1] grievances are confined to the following: (1) the failure of the plan to prescribe standards for faculty and staff desegregation; (2) its failure to provide for integration of the 11th and 12th grades in one of the four high schools in the district; and (3) its imposition of an inordinate number of the burdens of desegregation on blacks. Finding the first and second contentions to be meritorious, and the third to be irresolvable on the record before us, we reverse as to the first two contentions and remand for further proceedings in accordance with this opinion. The remainder of the district court's decree will not be disturbed.

## I

The instant district court order marked the culmination of a protracted, albeit laudable effort on its part to secure a unitary school system in Waco. It was rendered approximately eight years after the Board of Trustees had been directed to dismantle the WISD's segregated school system. As of the 1972–73 school year, the system's student composition was 58.3% white, 28.4% black, and 13.3% Mexican-American.

The Board plan, adopted by the court, was drawn around the four public high schools located in the district. The boundaries for junior high and elementary school zones, fashioned to insure the presence of integrated feeder systems into the high schools, created four component sectors or quadrants of the WISD: (1) University High, (2) Waco High, (3) Jefferson-Moore High, and (4) Richfield High. The record is largely bereft of any data concerning the district's demographic patterns, distances between schools situated within each quadrant, and distances between schools serving comparable grade levels in different quadrants.[2]

As was noted above, appellants' objections to the court-ordered plan are threefold.[3] First, it failed to condition acceptance of the plan upon compliance with the mandates of Singleton v. Jackson Municipal School District, 419 F.2d 1211 (5th Cir.), rev'd on other grounds, Carter v. West Feliciana School Bd., 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477

---

1. Appellants brought a class action on behalf of black and Mexican-American children residing in and eligible to attend the Waco, Texas public schools.

2. The only demographic data, other than a statistical breakdown of black, Mexican-American and white students in the district, was a general description of the racial composition of each quadrant. South Waco, while possessing a slight Anglo majority, contained the bulk of Mexican-American population in the district. North and Northeast Waco contained a substantial Anglo majority and a black student composition reflective of that in the entire district. East and West Central Waco possessed sizable black and white populations. Finally, Northwest Waco was predominantly white. The four sectors alluded to in the text are largely in conformity with the geographical breakdowns noted herein.

3. Three alternative plans were submitted by appellants. The Finger plan called for the conversion of all schools into centers for grades 1–4, 5–8, and 9–12, with grades 5–8 located in or on the fringe of minority communities and grades 1–4 and 9–12 to be bussed to schools in Anglo majority areas. The Black Federation proposed a 3–3–3–3 plan with space reserved in each school for a percentage reflecting the percentage of each racial or ethnic group in the community with those residing closest to the school given first priority. A third plan, submitted by Arvizu plaintiffs, consisted essentially of objections to the Board's proposal. In view of the conceded efficacy of the Board plan in effecting desegregation in the WISD and the absence of any evidence which suggests that these plans would be demonstrably less burdensome to blacks and Mexican-Americans than the court approved plan proposed by the Board, we need not further address the alternative plans.

(1970). Although the Board plan was concededly remiss in this respect, the district court merely required the Board to submit semi-annual progress reports regarding criteria for recruitment, hiring and assignment of Mexican-American teachers and of black and Mexican-American administrative personnel.

Appellants' second objection was prompted by the continued segregated operation of the 11th and 12th grades at the predominantly black Jefferson-Moore High School and the predominantly white Richfield High School for two years, with the only exception being that students from Richfield would attend 11th grade English and 12th grade government classes at the Jefferson-Moore High School. Classes for all 10th grade students in the two quadrants are conducted at Richfield High School.

The third objection to the plan is that it places a disproportionate number of the burdens of desegregation upon minority students. As a result of the plan, 1,906 black students (approximately 37%) and 1,467 white students (approximately 14%) are bussed fulltime. An additional 1,271 black students are bussed pursuant to a 1970 order which consolidated the Waco and LaVega School Districts, thereby increasing the percentage of blacks bussed to approximately 62%.[4] The course pairing for Richfield and Jefferson-Moore High School students accounts for the transportation of an additional 648 whites and 132 blacks.[5]

Appellants object specifically to the closing of four predominantly black schools, two at the elementary school level (Nalley and Sanger Avenue) and two at the junior high school level (Wiley and West Junior High Schools)[6] and the conversion of two predominantly black elementary schools (Oakwood and Sul Ross) into integrated kindergarten and 6th grade centers.[7] The junior high school closings necessitated the redistribution of students to the remaining junior high schools in the four quadrants. The closing of Sanger effected a redistribution in the Jefferson-Moore Sector and the remaining closing and school conversions effected a redistribution in University High Sector, all at the elementary school level. The student displacement created by the closing and conversion measures allegedly deprived minority students of neighborhood

4. As a result of a 1970 suit, initiated by the Justice Department against the Texas Education Agency, a district court entered an order approving a plan for disestablishment of the LaVega District dual structure. The implementation of this plan resulted in the transformation of the LaVega District into a predominantly black district. This latter development prompted the district court to grant a motion to annex LaVega to the Waco District in 1971. We emphasize this development in order to avoid a distorted perception of the bussing statistics and the problems which naturally and inevitably resulted from the court ordered change.

5. The evidence indicates that some whites are bussed in order to enable them to attend the predominantly white Crestview Elementary School, and hence to this extent the burden exacted of white students as a result of the desegregation decree is lessened. The evidence is somewhat vague as to how many blacks and how many whites are being bussed as a result of the plan. Statistics do not indicate the number or proportion of Mexican-American students being bussed.

6. The Nalley school was situated in the University High Sector, West in the Jefferson-Moore Sector and Wiley in the Richfield Sector. It would appear from the record that the Sanger Avenue school was situated in the Jefferson-Moore Sector. Although historically white schools, Nalley and Wiley were predominantly black and Sanger Avenue and West Junior High were racially mixed at the time of their closing.

7. In their brief, appellants also challenge the conversion into one grade centers of South Junior High School and Brook Avenue, R. L. Smith and J. H. Hines Elementary School, located in the University High, Waco High, Jefferson-Moore and Richfield Sectors respectively. These conversions were alluded to only briefly at best in the hearing before the district court. To the extent the parties are instructed on remand to cure evidentiary deficiencies regarding the ramifications of the Sul Ross and Oakwood conversions, they must also cure such deficiencies regarding the conversion of the former four schools.

schools and heightened the need for bussing of minority students.

## II

Having identified appellants' contentions we proceed to consider their viability.

### A. *Non-Compliance with Singleton*

█ Appellants' claim that the court ordered plan does not comport with *Singleton* prescriptions is correct. The Board has, however, subsequently formulated its recruiting, hiring and assignment criteria for faculty and administrative personnel and incorporated them in its brief on appeal. Since the district court should pass upon their propriety in the first instance, we remand in light of *Singleton* and its progeny.

### B. *Failure to Integrate 11th and 12th Grades of Jefferson-Moore and Richfield High Schools*

The viability of the proposed two-year delay in integrating Jefferson-Moore and Richfield High Schools is governed by the Supreme Court's observation in Davis v. Bd. of School Commissioners, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577, 581 (1971) that "[h]aving once found a violation, the district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation, taking into account the practicalities of the situation." *See* Wright v. Council of the City of Emporia, 407 U.S. 451, 461–462, 92 S.Ct. 2196, 2202–2203, 33 L.Ed.2d 51, 61 (1972); Swann v. Charlotte-Mecklenburg Bd. of Education, 402 U.S. 1, 26, 28, 91 S.Ct. 1267, 1281, 1282, 28 L.Ed.2d 554, 576 (1971). *See also* Alexander v. Holmes County Bd. of Education, 396 U.S. 19, 90 S.Ct. 29, 24 L.Ed.2d 19, rehearing denied, 396 U.S. 976, 90 S.Ct. 437, 24 L.Ed.2d 447 (1969). The Board's justification for its proposal is

that it would prevent disruption of extracurricular activities and the purchasing of class rings and would maintain student feelings of pride and tradition in the schools.

Were this measure to terminate at the end of the 1973–74 school year, we would be more favorably inclined to approve. We could then discern the benevolent aims which this measure is designed to and indeed has served. But its extension for a second school year will invariably cause as much disruption to school ties upon expiration of the two year delay as would have the desegregation of the two schools at the time the district court decree was rendered. For if the temporary measure is operative for a second year, then the incoming 11th graders like the present 12th graders, will have cultivated the same ties with their schools that the Board desired to avoid jeopardizing. Hence, the justification for allowing the temporary proposal to be operative for a second year is attenuated.

██ Moreover, this court has, with limited exceptions, disapproved of school board plans which exclude a certain age grouping from school desegregation,[8] and has assiduously adhered to the proposition that part-time desegregation, while a salutary adjunct of desegregation plans, cannot be used as a substitute for the complete dismantling of a segregated school system. United States v. Texas Education Agency, 467 F.2d 848, 872 (5th Cir. 1972) (en banc); *id.* at 885 (Bell, J., concurring); United States v. Bd. of Education of Webster County, 431 F.2d 59, 61 (5th Cir. 1970); Hightower v. West, 430 F.2d 552, 557 (5th Cir. 1970); Bivins v. Bibb County Bd. of Education, 424 F.2d 97, 98 (5th Cir. 1970); *cf.* Miller v. Bd. of Education of Gadsden, Alabama, 482 F.2d 1234, 1236 (5th Cir. 1973). Thus, in Taylor v. Ouachita Parish School Bd., 424 F.2d 324, 326 (5th Cir. 1970), when

---

8. *See* Flax v. Potts, 464 F.2d 865, 869 (5th Cir.), cert. denied, 409 U.S. 1007, 93 S.Ct. 433, 34 L.Ed.2d 299 (1972) *and* Lockett v. Bd. of Education of Muscogee County School District, 447 F.2d 472, 473 (5th Cir. 1971) (non-inclusion of children in kindergarten is permissible because of the peculiarities of the kindergarten program).

confronted with the retention of an all-black high school, justified by a biracial committee in order to maintain the school's identity, this court responded as follows:

> "This explanation does not overcome the 'heavy burden upon the board' to justify 'its preference for an apparently less effective method' in the face of the more promising course of action which is available in the HEW plan. Green v. New Kent County School Board, 1968, 391 U.S. 430, 439, 88 S.Ct. 1689, 20 L.Ed.2d 716. Since the HEW plan is the only one currently available that gives any promise of ending the dual system with respect to Richwood High we must order its implementation."

*See also* Lee v. Macon County Bd. of Education, 448 F.2d 746, 753 (5th Cir. 1971); United States by Mitchell v. Choctaw County Bd. of Education, 417 F.2d 838, 842 (5th Cir. 1969). This response compels our conclusion that in the instant case student affinity for a school is not a practicality which under *Davis* can vitiate the command for the most effective desegregation decree.

■ We intimate no view as to whether any heretofore unexpressed difficulties occasioned by the prospective integration of the two high schools may constitutionally justify a failure to integrate them completely. That bussing of students is taking place under the course pairing measure of limited duration tends to belie the suggestion that any of the customary difficulties will in fact be encountered.[9] Consequently, on remand, the district court should order the Board of Trustees to formulate a plan for integrating Jefferson-Moore and Richfield High Schools, effective for the 1974–75 school year, unless evidence is adduced that such integration is impractical under the rationale of *Davis*.

### C. *Disproportionate Burdens of Desegregation*

■ Although not without some ambiguity, appellants claim that the impermissible burdens of desegregation imposed upon them are evidenced by the elimination of neighborhood schools in the University High Sector in contravention of the Board's avowed policy of preserving neighborhood schools, and the disproportionate number of black school children bussed to implement desegregation plans. These burdens are attributable to school closings and the suspended operation of grades 1–5 and the attendant conversion to kindergarten and 6th grade centers in certain schools in the district. The viability of appellants' contentions invariably rest upon the validity of the Board's justifications for its proposals and the availability of feasible alternatives to the measures that appellants deem objectionable. Since it is incumbent upon district courts to insure that the burdens of desegregation are distributed equitably, *see* United States v. Texas Education Agency, *supra* at 885 (Bell, J., concurring); Cisneros v. Corpus Christi Independent School District, 467 F.2d 142, 153 (5th Cir. 1972) (en banc); Lee v. Macon County Bd. of Education, *supra* at 753–754; *cf.* Quarles v. Oxford Municipal Separate School District, 487 F.2d 824, 826 (5th Cir. 1973); United States v. Greenwood Municipal Separate School District, 460 F.2d 1205, 1207 (5th Cir. 1972); Mims v. Duval County School Bd., 447 F.2d 1330, 1331–1332 (5th Cir. 1971), and the record is devoid of evidence which would enable us to determine whether this duty has been complied with, we must remand to the district court for further consideration in light of the following observations.

### 1. *School Closings*

■ The Board's proposed closing of Nalley and Sanger Avenue Elementary

---

9. Transportation hazards and difficulties are, under *Swann*, justifiable reasons for non-inclusion of certain grades in a school desegregation plan. *See* Ellis v. Bd. of Public Instruction of Orange County, 465 F.2d 878 (5th Cir. 1972); Lee v. City of Troy Bd. of Education, 432 F.2d 819 (5th Cir. 1970).

Schools and West and Wiley Junior High Schools cannot withstand scrutiny if, as appellants maintain, such closings were for racial reasons. *See* Stout v. Jefferson County Bd. of Education, 483 F.2d 84, 86 (5th Cir. 1973); United States v. Texas Education Agency, *supra*; Lee v. Macon County Bd. of Education, *supra*; Allen v. Bd. of Public Instruction of Broward County, Fla., 432 F.2d 362 (5th Cir. 1970); Carr v. Montgomery County Bd. of Education, 429 F.2d 382 (5th Cir. 1970). The district court's truncated explanation for approving the school closings was as follows:

> "Of the four schools closed, two (Nalley and Wiley Jr. High) are predominantly black schools, and two (Sanger Ave. and West Jr. High) possess racially mixed student bodies, are located in racially mixed neighborhoods, and are not identified in either the black or the white community as predominantly or historically black schools. Thus, we have no impermissible closing of formerly black schools for racial reasons."

We are unconvinced that this reasoning when viewed in light of the evidence adduced in the record satisfies what this court has characterized as a heavy burden to explain the closing of facilities used for the instruction of minority students.[10] United States v. Texas Education Agency, *supra* at 872. *See also* Haney v. County Bd. of Education, 429 F.2d 364, 372 (8th Cir. 1970).

■ The Board proffered three explanations for the school closings: first, the schools were housed in out-moded facilities, second, they operated at under capacity or had a capacity so limited that the costs of operation were prohibitive, and third, they were confined by a small physical plant. Each of these justifications is facially legitimate. But where measures proposed by a school board are challenged, the Board must adduce evidence sufficient to support the conclusion that their actions were not in fact motivated by racial reasons, *see* Keyes v. School District No. 1, 413 U.S. 189, 209, 93 S.Ct. 2686, 2698, 37 L.Ed.2d 548, 564 (1973). To the extent that other schools which were kept open operate under the same handicaps from which the closed schools suffered, the viability of the Board's justifications is diluted commensurately. *See* United States v. Texas Education Agency, *supra* at 872.

■ The challenge to the closing of the Nalley School is ill-founded. It lacked a cafeteria and possessed only a make-shift library. Moreover, its capacity (100) was so limited that the costs of operating it were prohibitive. Since no other school in the district was of comparable capacity, the Board's decision to terminate operation at Nalley was clearly warranted. The same conclusion cannot, on this record, be drawn with respect to the other three schools.

It is uncontroverted that West, Wiley and Sanger Avenue operated at substantial under capacities. But the disparity between enrollment and capacity at Wiley, for example, was paralleled by that at the South Junior High School which remained in operation. Moreover, the under capacity at Sanger only slightly exceeded that at Parkdale, Crestview,

10. Under Keyes v. School District No. 1, 413 U.S. 189, 197, 93 S.Ct. 2686, 2691, 37 L.Ed. 2d 548, 557 (1972) and Cisneros v. Corpus Christi Independent School District, *supra* at 144–145, schools in Texas with a combined predominance of black and Mexican-American students are eligible to be classified as "segregated schools." In *Keyes*, the Court identified the composition of the student body and of faculty and staff, and community and administration attitudes toward the school as factors to be considered by a district court in determining whether a school is segregated. The district court's response to the school closing challenge fails to take cognizance of the student and faculty composition factors, a failure which may or may not have led to the characterizations of West Junior High (approximately 70% black and Mexican-American) and Sanger Avenue (approximately 65% black and Mexican-American) schools as racially mixed and not segregated. A conclusion on remand that these schools are "segregated" will trigger the Board's heavy burden to justify the closing of these two schools.

and Hillcrest Elementary Schools— schools that also were utilized under the Board's plan.[11] In addition, while the dates of construction of the West (1914), Wiley (1938) and Sanger Avenue (1903) Schools when coupled with wear and tear attendant upon student occupancy may have resulted in the deterioration of facilities in these schools, the record is bereft of evidence which indicates that facilities of the closed schools are inferior to those in other schools in the district. Similar data comparing the physical plants of the Sanger Avenue, West and Wiley Schools with those of other schools still in operation is also absent.

Moreover, in contradistinction to the Board's claims that the three schools were deficient, Superintendent of Schools Dr. Avery Downing stated his belief that the closed schools could have been utilized for the 1973–74 school year had it not been for the Board plan. He also testified that he had submitted several plans to the Board, some of which proposed that the three schools be used to house both black and white children but that the Board merely responded by endorsing the instant plan. Finally, Dr. Downing noted that the West and Wiley closings resulted in substantial over enrollment at the remaining junior high schools.[12]

▮▮▮▮ Thus, on remand the district court should re-examine the justifications for closing the Sanger, West and Wiley schools in light of the characteristics of the schools permitted to remain in operation, *see* United States v. Texas Education Agency, *supra* at 872; *see also* Jones v. Caddo Parish School Bd., 487 F.2d 1275, 1277 (5th Cir. 1973), and additionally the timing of the proposed school closings, *see* Wright v. Council of the City of Emporia, *supra* at 465, 92 S.Ct. at 2204, 33 L.Ed.2d at 63. The existence of some schools with either com-

11. The following statistics indicate the degree of under enrollment at various schools in the district:

| | School | M-A | Bl. | Wh. | Total | Capacity |
|---|---|---|---|---|---|---|
| Closed: | West | 74 | 218 | 128 | 420 | 575 |
| | Wiley | 4 | 391 | 0 | 395 | 500 |
| | Sanger Ave. | 74 | 162 | 111 | 347 | 500 |
| Open: | South Junior | 153 | 228 | 116 | 497 | 600 |
| | Parkdale | 3 | 55 | 378 | 436 | 500 |
| | Crestview | 27 | 53 | 383 | 463 | 600 |
| | Hillcrest | 9 | 65 | 296 | 370 | 450 |

The problem of under enrollment at the latter four schools remains unabated by the Board plan. Moreover, at the Gurley and Kendrick elementary schools, under enrollment is exacerbated by 122 and 59 respectively to reflect under capacities of 184 and 103.

12. The result of the junior high school closings is witnessed by the following discrepancies between enrollments and capacity at the schools remaining open:

| School (Sector) | Total 1972-73 | Projected 1974-75 | Capacity |
|---|---|---|---|
| Lake Air Jr. High (Richfield) | 859 | 1,274 | 900 |
| North Jr. High (Waco) | 742 | 882 | 625 |
| South Jr. High (University) | 497 | 507 | 600 |
| Tennyson Jr. High (Jeff-Moore) | 755 | 925 | 750 |
| University Jr. High (University) | 1,032 | 1,007 | 900 |

parable facilities, physical plants or under capacities need not inexorably condemn the Board's decision to close Sanger, West and Wiley as one prompted by impermissible racial considerations. But in view of Superintendent Downing's testimony, and the heavy burden imposed upon school officials to justify the closings, a finding that more than an isolated few schools presently in operation suffer from the same deficiencies which plagued the closed schools should militate against the need for such closings.

2. *Suspension of the Operation of Certain Grades*

The elimination of neighborhood schools and the ineluctable increased bussing of black students required as a result is also traceable to the suspension of grades 1–5 in the predominantly minority Sul Ross and Oakwood elementary schools in the University High Sector. Under the Board's plan, all students in grades 1–5 in this sector presently attend one of six elementary schools, and the formerly predominantly minority Oakwood and Sul Ross Schools house all kindergarteners and 6th graders respectively. Three witnesses testifying on behalf of the Board explained that they believed it was the most practical means for desegregating elementary schools in the University High Sector. Such general asseverations are insufficient if, as appellants maintain, the grade conversions deprive minority students of their neighborhood schools and concomitantly result in a proliferated bussing of minority students.

The paucity of evidence bearing upon the propriety of the grade conversions at Sul Ross and Oakwood precludes us from passing upon appellants' contention. The record does not reveal the extent to which bussing of minority students has been increased by this measure.[13] Moreover, we hasten to note that unless appellants can point to additional proposals of the Board which allegedly spawn the imposition of inequitable burdens of desegregation upon minority students, a court is powerless to mitigate them. In this vein, we reiterate that the annexation of the LaVega District to the Waco District accounts for the bussing of 1,271 of the 3,177 black students being transported. Unless some infirmity is discernible in the plan for assimilating the former LaVega students, the bussing of these students must be tolerated.[14]

Conversely, however, if the Board's measures do in fact increase these burdens, then it will be incumbent upon the Board to justify their actions. That students who formerly attended Sul Ross and Oakwood are purportedly being bussed and that Sul Ross and Oakwood are presently housing white and minority students in the 6th grade and in kindergarten tends to belie the assumption that educational considerations preclude the use of both schools for children in grades 1–6.

### III

As we noted earlier, the Board and the district court have made a commendable attempt to dismantle the WISD dual school system. With the exception of the 11th and 12th grades at Jefferson-Moore High School, the district is in fact desegregated. Our decision cures this problem as well as that posed by noncompliance with *Singleton*.

---

13. Despite persistent cross-examination by appellants' counsel, neither of the three Board witnesses was able to produce statistics on the bussing increases necessitated by the desegregation plan.

14. During the interim from the initial La-Vega desegregation order in 1970, *see* note 4 *supra*, and the annexation of LaVega to the Waco District, the closed black school has been vandalized to the extent that Waco school authorities deemed it unusable. The

1,400 LaVega black students have been assigned to schools, suggested by the Justice Department, which formerly served predominantly white students and which are located in predominantly white neighborhoods. That the former LaVega students are bussed to school is lamentable, although apparently unavoidable at present. We would, however, encourage the Board to reevaluate its plan for assimilating these students into the Waco school system, when and if, the La-Vega school is rehabilitated.

Despite the efforts of the Board and the district court, however, it may be that appellants are shouldering a greater proportion of the burden of desegregation than that which is constitutionally permissible. Although a district court has wide discretion in formulating remedial decrees, such discretion is abused where a district court "approves a plan that, in the hope of providing better 'quality education' to some children, has a substantial adverse effect upon the quality of education available to others." Wright v. Council of City of Emporia, *supra*, 407 U.S. 451, at 463, 92 S.Ct. 2196, at 2204, 33 L.Ed.2d 51, at 62. In view of the catholicity of opinion as to the hardship occasioned by the loss of neighborhood schools and the necessary bussing that such a loss entails,[15] we remand for a determination of whether the closing and suspended operations in the aforementioned schools was justified.

Reversed in part and remanded with directions.

---

15. The most eloquent statement of these hardships is rendered by Justice Powell, concurring in part, and dissenting in part in Keyes, *supra*. *See also* Brice v. Landis, 314 F.Supp. 974, 978 (N.D.Cal.1969), *cited approvingly* in Lee, *supra* at 754 n.12.