UNITED STATES of America, Plaintiff,

and

Jonathan Martin, a minor, by his mother and next friend, Dian Martin; Darnell Evans, a minor, by his mother and next friend, Verna Evans; Charlie Morgan and David Morgan, minors, by their mother and next friend, Gloria Morgan; Heidi Riley and Angela Riley, minors, by their mother and next friend, Carla Riley; Crystal Thomas, a minor, by her mother and next friend, Zeneth Thomas; Doris Dillworth and Geraldine Murry, Plaintiffs–Intervenors,

v.

SCHOOL DISTRICT OF the CITY OF FERNDALE, MICHIGAN; Members of the Board of Education of Ferndale, Michigan; the State of Michigan; William Milliken, Governor of Michigan; Michigan State Board of Education; John W. Porter, Defendants.

Civ. A. Nos. 75–70958, 76–70871.

United States District Court,
E. D. Michigan, S. D.

Oct. 7, 1980.

368

Iris McCollum Green, General Litigation Section, Civil Rights Div., U.S. Dept. of Justice, Washington, D. C., for plaintiffs.

William Waterman, Waterman, Hooe, Curry & Hughes, Pontiac, Mich., for intervening plaintiffs.

Burton A. Shifman, John A. Carlson, Shifman & Goodman, Southfield, Mich., for School Dist. of the City of Ferndale.

Frank Kelley, Atty. Gen., by Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., for state defendants.

OPINION

GILMORE, District Judge.

For more than a decade, the Ferndale School District has been defending itself, either in Court or in administrative hearings, because it operated an intentionally segregated school, the Ulysses S. Grant School, for the great majority of black students in the District. The instant litigation, filed in 1974, seeks to require the District to desegregate the Grant School. It has been to the Court of Appeals twice. It is now time for litigation to end, for school admin-

istrators to administer, for teachers to teach, and for students to learn, in a school system free from segregation.

The sole issue before the Court concerns the development of a plan of desegregation as ordered by the Court of Appeals in *United States v. School District of Ferndale et al.*, 616 F.2d 895 (C.A.6 1980). In addition to the original parties, several individuals representing parents, students and teachers, primarily from the Grant School District, were allowed to intervene as plaintiffs to address the issue of remedy.

In this case, the Court of Appeals reversed this Court's predecessor and found de jure segregation in the Ferndale School District, holding (page 904):

"[T]he creation of the Grant School was motivated by racial reasons and was intentionally segregative in purpose and effect . . .

" . . . we find as facts that the Grant School was built to be a black school, in violation of the Constitution of the United States . . . and has been intentionally operated as such in the intervening years . . .

.        .        .        .        .

"In this case, the effect of the original segregative purposes have not been dissipated at all; indeed, the continued segregative purpose of the Ferndale School District Board has continued down to and through the date of the District Court trial.

"The plaintiffs in this case have clearly demonstrated a 'causal nexus between intentional segregative actions and the conditions they seek to remedy' . . ."

As to remedy, the Court of Appeals, in remanding the case to the District Court, said this (page 906):

"We feel it appropriate for the issue of systemwide impact and the question of remedy to be remanded to the District Court for further consideration. . . . the District Court should find a feasible desegregation plan sufficient to accomplish the wiping out of all vestiges of unconstitutional segregation relatively easy to define. *In that regard, however, it should require the Ferndale School District Board in the first instance to propose remedial measures needed to accomplish wiping out the vestiges of segregation in the Ferndale School District–'root and branch.'*" (emphasis added).

Pursuant to that mandate, the School District proposed a plan which was considered and rejected by this Court on July 17, 1980. That plan proposed that the regular or traditional Grant School, which was totally black, be closed, except for kindergarten. It further provided that an open classroom voluntary program, which had been operating at Grant for several years, be continued. This program is totally separate from the traditional program at Grant, except for a common lunchroom, common physical education classes, and common music classes. Any student in the elementary grades in the Ferndale School District could attend the open classroom program if he or she desired. Significantly, the open classroom program was developed at the Grant School, at least in part, to reduce the racial identifiability of Grant and to make Grant a more appealing school to students and parents outside of the Grant attendance zone. The program has a predominantly white enrollment.

The School Board's plan also called for the establishment of several new programs at Grant, in the place of the traditional Grant School. The Board proposed a program known as LEAP, the Later Elementary Academic Program, to give special assistance to persons in the fourth, fifth, and sixth grades who had experienced academic failure. In addition, the Board's plan called for the establishment of an alternate first grade program which would give special instruction to first grade students needing special care.

Coupled with these new programs to be established at Grant, the Board's plan required that all of the students of the traditional Grant School program, which is totally Black, attend other elementary schools in the district, either on a voluntary or assignment basis.

This Court rejected the Board's plan, pointing out in its opinion delivered from the bench on July 17, 1980:

"... It is absolutely clear ... that the burdens of desegregation must be shared equitably, and where you have had a system of de jure desegregation, and that was found in this case ... by the Court of Appeals, ... one way bussing and putting the total ... burden ... to correct that upon blacks only is unconstitutional ... *N.A.A.C.P. v. Lansing Board of Education*, 559 F.2d 1042 (C.A.6 1977); *Higgins v. Board of Education of City of Grand Rapids* 508 F.2d 779 (C.A.6 1974)."

In short, this Court held that one–way bussing of minority students, in a system which has a history of de jure segregation, violated the equal protection guarantee of the U.S. Constitution, and, therefore, rejected the plan.

I

In August 1980, a second plan was presented to the Court by the Board. The plan was known as the Sixth Grade Center Plan, and provided for:

1. The maintenance of the Open Classroom Program at Grant School;

2. The maintenance of the Grant kindergarten program for Grant attendance area students;

3. The maintenance of the sixth grade at Grant;

4. The transfer of sixth grade students from Washington, Jefferson, Taft and Roosevelt Schools to Grant School; and

5. The transfer of Grant students in grades 1 through 5 to Jefferson, Taft, Roosevelt and Washington schools.

In short, the defendant's program would maintain the open classroom program at Grant and allow those in kindergarten at Grant to remain there. All Grant sixth graders would stay at Grant, but all other Grant students—those in Grades one through five—would be transferred to Jefferson, Taft, Washington and Roosevelt schools. All sixth graders from those schools would go to Grant. Grant School would thus become a "Sixth Grade Center".

The Court ruled at trial that, if this plan were constitutional, it had to be accepted by the Court because of the mandate of the Court of Appeals allowing the school district to submit a plan for the Court's consideration. It was further held at trial that if the Court found this plan to be unconstitutional then the Court would devise its own plan.

■ The Board's second proposal–The Sixth Grade Center Plan–is clearly unconstitutional, for it puts the burden of desegragation almost solely on black students.

To thoroughly understand the situation in Ferndale, one must refer to the map of the Ferndale School District received in evidence as plaintiff's exhibit number 3, and attached hereto as Appendix A. The Grant School, insofar as its traditional education program is concerned, is 100 percent black and was built for the specific purpose of segregating black students from their white counterparts in the school district.

The surrounding schools which would participate in the plan proposed by the Board–Jefferson, Washington, Taft, and Roosevelt-are practically 100 percent white. Jefferson has 4.1 percent black students; Taft has 3.8 percent black students; Washington has 5.8 percent black students, and Roosevelt has 4.8 percent black students.

In justifying the plan, defendant claims that sixth grade students are a unique transitional age group and that the development of a Sixth Grade Center will allow for innovative teaching techniques. It further contends that the conversion of Grant into a Sixth Grade Center would avoid resegregation in that "sixth grade students are closer in age to junior high students who traditionally attend school farther from home than younger children." (Exhibit 1). Defendant claims that school boards, in devising desegregation plans, have considerable discretion based upon their educational expertise and that the Constitution does not require exact equality in weighing the respective burdens imposed upon black and white students.

Plaintiff and plaintiff intervenors, on the other hand, contend that the Sixth Grade Center Plan places an unequal burden on black students and is therefore unconstitutional. They say that white students would be required to attend school out of their home district only one year, while black students would be bussed to schools away from their home school district for five years. Further, plaintiffs claim that all of the alleged advantages of the Sixth Grade Center are speculative and that many of the techniques pointed out by the defendant, such as team teaching and extensive human relations and job counseling, can be implemented in a more traditional educational model.

In short, plaintiffs describe the Sixth Grade Center Plan as essentially an experimental program with alleged benefits which do not counterbalance the unduly heavy burden placed upon black students.

The proposal of the Board would require Grant students to leave their neighborhood schools for a period of five years, while white students would be required to leave their neighborhood schools for only one year—in the sixth grade. It is clear that the plan does not meet constitutional muster. It places an inequitable and unconstitutional burden of desegregation upon black students residing in the Grant School District.

It was pointed out in *Arvizu v. Waco Independent School District*, 495 F.2d 499, 504 (C.A.5 1974):

"[I]t is incumbent upon district courts to insure that the burdens of desegregation are distributed equitably, . . ."

■ Where a plan requires black children to carry a substantially greater proportion of the burden of desegregation than white children, and where a history of de jure segregation exists, as here, such a plan will not withstand Constitutional scrutiny. In a situation such as the Ferndale one, the burden of desegregation must be equally shared. *N.A.A.C.P. v. Lansing Board of Education* 559 F.2d 1042 (C.A.6, 1977); *Arvizu* (supra).

Significantly, the *Arvizu* case also involved the transformation of a school that was formerly attended predominately by minorities into a Sixth Grade Center and the bussing of students in grades 1 through 5 to other schools. The *Arvizu* Court ordered the case remanded on the issue of whether the development of the Center placed an undue burden on the minority students. The Court said:

"The elimination of neighborhood schools and the . . . increased bussing of black students required as a result is also traceable to the suspension of grades 1–5 in the predominantly minority Sul Ross and Oakwood elementary schools in the University High Sector. Under the Board's plan, all students in grades 1–5 in this sector presently attend one of six elementary schools, and the formerly predominantly minority Oakwood and Sul Ross Schools house all kindergarteners and 6th graders respectively. Three witnesses testifying on behalf of the Board explained that they believed it was the most practical means for desegregating elementary schools in the University High Sector. *Such general asservations are insufficient if, as appellants maintain, the grade conversions deprive minority students of their neighborhood schools and concomitantly result in a proliferated bussing of minority students.*" (emphasis added) *Id.* at 507.

Here, the defendant's plan results in the elimination of the traditional program at the Grant School, while preserving the traditional program at all of the elementary schools where white students predominate. The neighborhood or local elementary school for whites is preserved, while such a benefit as to blacks in the Grant attendance zone remains illusory.

It is argued by the School Board that there are special benefits to the Sixth Grade Center Plan which will enrich the educational opportunities of all the students in the Ferndale School District, including the black students. This contention was disputed. But assuming that such a system would provide an enriched educational program at the sixth-grade level, it could scarcely be considered a proper plan for

372

desegregation. Circuit Judge William E. Doyle in *Keyes v. School District No. 1, Denver, Colorado*, 380 F.Supp. 673, 682 (D.C.1974), (reversed in part on other grounds, 521 F.2d 465 (C.A.10 1975), said:

"The special education programs which are suggested involving the enrichment offerings together with the open school concept and the special programs designed for use in segregated schools are desirable, but the emphasis is on enriched education and can scarcely be considered a plan for desegregation. Thus, the transporting of students from concentrated schools to enrichment centers for three weeks on a half day basis to intermingle with other ethnic groups while engaging in special programs does not pretend to be a desegregation plan. It impresses us, on the contrary, as a plan which is more designed to avoid adoption of a desegregation plan. . . ."

Thus, here, the alleged benefits of the Sixth Grade Center approach cannot excuse the obviously inequitable burden placed upon black students. Unlike *Keyes* (supra), the Board's plan would desegregate the schools. But the plan fails to accomplish constitutional desegregation.

The Constitution will not tolerate a desegregation plan that places a five to one burden on black students as compared to white students in a school district with a history of de jure segregation.

Therefore, the Court must, of necessity, reject the plan submitted by the Ferndale Board of Education. *N.A.A.C.P. v. Lansing Board of Education*, 559 F.2d 1042 (C.A.6 1977); *Higgins v. Board of Education of City of Grand Rapids*, 508 F.2d 779 (C.A.6 1974).

II

■ In view of this holding, the Court must now devise a desegregation plan that will meet constitutional muster and effectively wipe out the vestiges of segregation in the Ferndale School District. It is well

settled that the Courts have broad equitable power in regard to such matters. In *Swann v. Board of Education* 402 U.S. 1, 15, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554 (1970), the Court said:

"If school authorities fail in their affirmative obligations under these holdings, judicial authority may be invoked. Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."

Necessarily, any plan devised by this Court must consider the impact of the de jure segregation of the Grant School on the remainder of the elementary schools in the district. *Swann*, (supra); *United States v. School District of the City of Ferndale* (supra).

Here, none of the evidence indicates that the defendant's de jure segregation extended to the remaining elementary schools. Rather, the construction of the Grant School is limited in effect to the area immediately surrounding the school. That area touches the Washington, Jefferson and Taft elementary schools. There are only 184 black students at Grant and a total of 321 black students in the entire school district. Further, of the 321, 234 black students reside in the Grant attendance zone. The total population of students enrolled in the Ferndale District is 2,952.

■ The Grant School is located in the far southwest corner of the Ferndale School District, and prior to its construction, black students attended the Jefferson and the Ridgewood Schools.[1] Neither of the parties has presented evidence and nothing in the record indicates that the de jure acts of segregation associated with the Grant School are sufficient to sustain a finding of system-wide impact. There is no need to involve elementary schools other than those in close proximity to the Grant School in any desegregation plan. Thus, the Court

1. The Ridgewood School is no longer in existence and the Taft School is located in approximately the same area.

finds that a desegregation plan involving only the Grant, Jefferson and Taft schools is constitutionally justifiable.

The Court must also note that any plan requiring the dispersion of such few numbers of black students, as exist in the defendant school district, among all of the elementary schools in the district is bound to impede the purpose of desegregation. Even the Ferndale Superintendent, Dr. William Coyne, testified that he wanted to avoid the "salt and pepper effect", namely the absorption of black students to such a degree that the educational benefits of desegregation would be neutralized.

■ Dr. William Gordon, an expert witness for the plaintiff, prepared a proposed cluster plan that would effectively desegregate Grant School, place an equal burden on white and black students and would allow students to remain in their home schools without movement for four of their seven years in elementary school (kindergarten through six). This plan is feasible and could be accomplished with a minimum of disruption of students' lives, according to testimony of Dr. Coyne.

Under the plan, the Open Classroom Program, which is 8.1% black, would be removed from the Grant School and placed in the Taft School, which is closely adjacent to Grant School. See Map, Appendix A.

The second portion of the plan would require the reassignment of Grant, Jefferson and Taft students in the following manner: Grant students in grades 4–6 would be divided between Taft and Jefferson; and Taft and Jefferson students, grades 1 through 3, would attend Grant School. The reassignment would result in the following racial configuration of the three schools:

| SCHOOL | GRADE | BLACK | WHITE | TOTAL | % black |
|--------|-------|-------|-------|-------|---------|
| Grant | K, 1–3 | 93 | 255 | 348 | 26.7% |
| Jefferson | K, 4–6 | 36 | 110 | 146 | 24.7% |
| Taft | K, 4–6 | 50 | 155 | 205 | 24.4% |

Exhibit 9 is an analysis by the School District of the proposed reassignments of Grant, Jefferson and Taft elementary school students as proposed by Dr. Gordon. The Exhibit points out that the plan is feasible in terms of space, teachers and the like, if the open classroom program is transferred to the Taft School. The LEAP Program, previously described, would go to Jefferson School, and the special first grade program would remain at the Grant School.

This plan would place an equal burden of desegregation upon white and black students in the Grant, Jefferson and Taft schools, would allow students to remain in their home schools for four of their first seven years of schooling, and would provide equal educational opportunities in a desegregated setting for all of the children at Grant, Taft and Jefferson schools.

This program would involve only these three schools in a cluster plan and would not require other elementary schools in the district to participate.

The Gordon plan accomplishes satisfactory desegregation, causes the least disruption of students, distributes the burden equally, and is, in the Court's opinion, a constitutional, practical and reasonable method of desegregation. Therefore, the Court will order that plan to be implemented.

Specifically, the plan will provide as follows:

1. The Open Classroom Program will be moved from the Grant School to the Taft School;

2. The LEAP Program will be transferred to the Jefferson School; .

3. The first grade supplemental education program will remain at the Grant School;

4. All kindergartners will remain in their own schools; that is, the present kindergartners attending Grant will remain at Grant; those attending Jefferson will remain at Jefferson, and those attending Taft will remain at Taft; and

5. All children in grades 1, 2 and 3 from the Grant, Jefferson and Taft Schools will

attend the Grant School. All fourth, fifth and sixth graders from Grant School will attend either the Jefferson or Taft School, and all fourth, fifth and sixth graders from Jefferson and Taft will remain at their respective home schools. The reassignment of Grant students in the fourth, fifth and sixth grades to Jefferson and Taft will be based upon their geographic locations. Those closest to Jefferson will attend Jefferson, and those closest to Taft will attend Taft.

This plan accomplishes desegregation of the Ferndale Schools and removes the last vestiges of de jure segregation in the Ferndale School District.

### III

The final issue before the Court involves the date of implementation of this order. The Court had hoped to be able to issue an order that would be effective at the beginning of the 1980 school year, but because of the complexity of this matter and the shortness of time given to the Court, it was unable to do so.

The School District argues that any implementation should be delayed until September 1981. The plaintiff, the intervenors, and the State of Michigan urge an earlier implementation, and suggest that it occur immediately after the Christmas holiday break. Testimony at trial by School Board Officials indicated that the ideal time for implementation would be at the beginning of a school year in September, but that if it had to be done other than at the beginning of the school year, immediately after the Christmas holiday break would be the best time, because of the length of the vacation time existing then.

■ The Supreme Court addressed this issue in *Carter v. West Feliciana School Board*, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 477 (1970). The Court held there, upon the facts in that case, that the implementation should take place within eight weeks. Other courts have required implementation of plans within seven weeks. See *United States v. Hinds County School Board*, 423 F.2d 1264 (C.A.5, 1969) and *Nesbit v. Statesville City Board of Education*, 418 F.2d 1040 (C.A.4, 1969).

It is obvious in this case that implementation of the plan should be accomplished as soon as practicable. This case has had a long and tortuous history. Litigation in the matter goes back to 1969, when the then–Department of Health, Education and Welfare decided to cut off all federal grants to the Ferndale School District because it found the system was operating an intentionally segregated system. This case was filed in 1974 and has been to the Sixth Circuit Court of Appeals twice.

It is time that the segregation of the Grant School be terminated once and for all, and it must be done as quickly as it can be done effectively.

Although it may be less than a perfect solution to rearrange school patterns in the middle of a school year, this Court cannot wait until September of 1981 for the implementation of its order. Everyone has waited too long already.

The Constitution demands early implementation, and, therefore, the plan set forth in this opinion must be implemented and placed into effect the first regular school day after the Christmas holidays of 1980–81.

A judgment embodying the findings of this opinion may be presented.

APPENDIX A