UNITED STATES of America,
Plaintiff-Appellant,

v.

SCHOOL DISTRICT OF the CITY OF
FERNDALE, MICHIGAN et al.,
Defendants-Appellees.

No. 79–1006.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 10, 1979.

Decided Jan. 30, 1980.

As Modified On Denial of Rehearing and
Rehearing En Banc April 4, 1980.

James K. Robinson, U. S. Atty., Detroit, Mich., Brian K. Landsberg, John C. Hoyle, Drew S. Days, III, Mildred M. Matesich, Dept. of Justice, Washington, D. C., for plaintiff-appellant.

Frank J. Kelley, Atty. Gen. of Michigan, Robert A. Derengoski, Sol. Gen., Gerald F. Young, Asst. Atty. Gen., Lansing, Mich., Burton R. Shifman, John A. Carlson, Philip J. Goodman, Southfield, Mich., for defendants-appellees.

Before EDWARDS, Chief Judge, and CELEBREZZE and LIVELY, Circuit Judges.

EDWARDS, Chief Judge.

This is a school desegregation case brought by the United States of America through the Attorney General of the United States, under the Equal Educational Opportunities Act of 1974, 20 U.S.C. §§ 1701–1758 (1976), and the State and Local Fiscal Assistance Act of 1972, 31 U.S.C. §§ 1221–1265 (1976), and under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6 (1976).

It follows lengthy litigation begun in 1969 wherein the HEW decided to cut off all federal grants to the Ferndale School District because it found that the District was operating an intentionally segregated school, the Ulysses S. Grant School, for the great majority of black students in the District.

HEW's decision was appealed to and affirmed by this court, and certiorari was denied by the United States Supreme Court. *School District of Ferndale, Michigan v. HEW*, 474 F.2d 1349 (6th Cir.), *cert. denied*, 414 U.S. 824, 94 S.Ct. 126, 38 L.Ed.2d 57 (1973).

Thereafter the instant litigation was filed in 1974 seeking to require the Ferndale School District to desegregate the Grant School. Motions to dismiss as to both the School District and the State defendants were made, heard, and granted by the District Judge, and on appeal were reversed by this court in an opinion by Judge Celebrezze, portions of which we reprint as Appendix A. The case was then remanded for trial and was ultimately tried by the same District Judge.

She admitted the record of the preceding HEW hearing and decision on the federal funds question. She also heard considerable additional evidence on the charges involved in the present desegregation case. At the conclusion of the trial, the District Judge found several instances of intentional segregative actions in the history of the Ferndale School District and the Grant School. Her ultimate conclusions, however, were that there was a "neutral" basis for the establishment of the Grant School in 1926 as a "neighborhood school" and that the instances of unconstitutional segregative actions which she found had in subsequent years been so attenuated in effect as to require no finding of present constitutional violation and (with one minor exception) no remedy applicable to desegregation of the Ferndale schools. In this regard she quoted and relied upon *Dayton Board of Education v. Brinkman*, 433 U.S. 406, 97 S.Ct. 2766, 53 L.Ed.2d 851 (1977) (*Brinkman I*). This case has now been further explicated by *Dayton Board of Education v. Brinkman*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) (*Brinkman II*), and *Columbus Board of Education v. Penick*, 443 U.S. 449, 99 S.Ct. 2941, 61 L.Ed.2d 666 (1979).

Founding our decision upon the total record, our reversal of certain clearly erroneous findings of the District Judge, and the additional light shed by *Brinkman II* and *Columbus*, we hold that there was intentional segregation in the construction and operation of the Grant School, and continuing segregative effect upon the Grant School and the Ferndale School District System to the date of trial. We therefore reverse and remand for appropriate relief.

## BACKGROUND

This case covers over a half century of history of a relatively small school district located immediately adjacent to the northern boundary of the City of Detroit and encompassing within its borders all or portions of several small Detroit suburbs. Some of the crucial facts occurred in the 1920's on the eve of a population explosion in Detroit and its northern suburbs, occasioned in part by the building of the Ford

Motor Company Highland Park Plant. Ferndale and its neighboring municipalities encompassed wholly or partly in the Ferndale School District were at the time subject to many subdivision covenants restricting housing occupancy to members of the caucasian race. In a half-mile square area at the southeast corner of the Ferndale School District, however, the Forest Grove and Detroyal subdivisions were not so restricted. This record discloses that black families had located in these subdivisions beginning approximately in 1920 and that by 1926 a substantial number of black families had homes there. The black children from the Forest Grove neighborhood were admitted freely to the Ferndale School District schools until 1925, with most attending the Ridgewood and Washington Schools. In 1926 the school population of black children had increased to over 100, the overwhelming majority of whom were enrolled at the Jefferson Elementary School which opened in 1925, constituting approximately one-third of its enrollment. In that year there is evidence of "racial turmoil" at the Jefferson School.

### CLAIMS OF THE PARTIES

It is the claim of plaintiffs HEW and the Attorney General that starting in 1925 a continuous course of conduct on the part of the Ferndale School District was begun to build a school (named for Ulysses S. Grant) for black children and to effect the intentional segregation of them within the boundaries of the half-mile square racially unrestricted area referred to above, and that as a result, purposeful segregation has affected the black children in that area from 1926 to the present, and the effects of that segregation have never been attenuated or dissipated so that equitable relief is now required from the federal courts.

Defendants, on the other hand, contend that the events beginning in 1925 which are referred to above, represent merely appropriate and educationally sound planning and construction of a neighborhood school to meet the needs of an increasing school population and that no segregative intent was involved. They also contend that if there had been segregative intent involved in the construction of the school at issue, the effects of that segregation have long since been attenuated and particularly have been dissipated by the inauguration in 1975 of an "open classroom" program at the school in question and the inauguration also in 1975 of a freedom of choice system for all students, augmented by free transportation.

### THE DISTRICT JUDGE'S FINDINGS

The District Judge who heard this case found that the building of the Grant School had the effect of segregating the black children in that attendance area but that this had not been the intent or the purpose of the Board in constructing the school. She also found that the choice of an all black faculty in the Grant School when it was opened represented *de jure* segregative conduct on the part of the School District, but that there was no evidence that the School District hired a black faculty with the intent or motive of segregating black students. She also found that the segregative practices in relation to black faculty on the part of the School District had no continuing effect on the present circumstances of the black children at the Grant School.

As to the operation of the School District, the District Judge found that in two years in the early 1940's black children at Grant were not transferred to Jefferson or other schools operating under capacity at a time when Grant was greatly overcrowded and educational opportunity had to be curtailed there by use of half-day sessions. She specifically found that transfers were not effected "because of feared opposition from the residents in the Jefferson area." She continued, "This failure to transfer students was motivated by racial considerations. School District's conduct in those years constituted *de jure* segregation to students to the Grant attendance area."

Pointing, however, to the decrease in enrollment at the Grant School in subsequent years, she held, "The evidence establishes that the failure to make either transfer has had no effect on present conditions," and

that the "School District has sustained its burden of proving that its acts in failing to transfer students temporarily to Jefferson, or even Taft, have no relationship to the existing segregation at Grant School." She concluded by holding, "the children in the Grant School attendance area are segregated because of *de facto* reasons." She also dismissed the action as to the State defendants for failure to give statutory notice.

## THE QUESTION OF SEGREGATIVE INTENT

In our consideration of this case, we recognize at the outset that it is distinguished from many school segregation cases. The Ferndale School District is in the State of Michigan, which state has never sanctioned segregation either by its constitution or by its statutes. Further, until 1926 the Ferndale School District itself never had, as one witness put it, "separate schools." Also, during the history of this case the Ferndale School District has had only one high school and first one and then two junior high schools serving all students in the District.

The facts which lead us to a contrary conclusion as to the Grant School from that reached by the District Judge may be found from this record as follows:

Until the beginning of the school year in 1925, the Ferndale School District had operated a unified school system in which parents could send their children to any school they chose. The Ferndale School District Board was aware of increased home building in the southern part of the District and pressure for space in existing schools. To meet these pressures, the Board had decided to build two additional schools—one of which, the Jefferson School, plays a major role in this case. On September 18, 1925, the Board drew mandatory attendance zones for the first time for all of its schools. This resolution included the Forest Grove and Detroyal subdivisions in the area assigned to Jefferson.

In September of 1925, Jefferson School opened and all of the black students from the Forest Grove and Detroyal subdivisions were transferred from the Washington and Ridgewood Schools to Jefferson.[1] For the balance of that year black students constituted between one-third and one-fourth of the Jefferson student body. This record contains many references to "turmoil" at the Jefferson School in the academic year 1925–1926. Although appellees contended the contrary, the District Judge found that the references were to "racial turmoil."

The Ferndale School District, which had abandoned its freedom of choice school policy the preceding year, fixed mandatory attendance district boundaries for the new Ulysses S. Grant School on the precise boundary lines of the one substantial area shown in this record to be without racial restrictions against black occupancy. The obviously predictable result was that the Grant School opened and remained until the United States intervened in the courts an all black school.

Prior to the building of the Grant School, this area was, as shown by this record, generally known as the Forest Grove area. The Ferndale School District named the new school the Ulysses S. Grant School after the general of the Union Armies in the Civil War which resulted in the end of slavery. After the building and naming of the Grant School, the record demonstrates that the racially unrestricted half-mile square area became known as the Grant area.

The attendance boundaries of the Ulysses S. Grant School were so drawn as to correspond closely with the boundaries of the racially restricted subdivisions in Ferndale which bounded the unrestricted area, then almost totally black, which was to be served by the Grant School.

The Grant School opened in the fall of 1926 with 123 black students and one white student. In the years subsequent to 1926 from the available records and the findings

---

1. Black parents in the Forest Grove area filed a lawsuit against the Ferndale School District protesting the transfer of students from Ridge- wood and Washington to Jefferson. (See Appendix B.)

of the District Judge, it appears that the Grant School student body was 100% black up to the school year 1974–1975.

Prior to the opening of the Grant School the Ferndale School District recruited and hired five black teachers. Prior to 1926, when the Grant School opened, the Ferndale School District had never hired a black classroom teacher. No white teacher was ever assigned to teach at the Grant School until 1964.

From 1926 until 1942 the Grant School was administered by the principal of the Jefferson School, who was white. No other schools in the Ferndale School District had or has ever operated with a shared principal.

Starting in 1932 a rapid increase of families in the Grant area occasioned overcrowding at the Grant School, which continued for 14 years, until the second of two additions to the Grant School was built. During all of those years, three adjacent schools, Jefferson, Washington and Taft, had excess capacity available. In 1946, after the second enlargement, Grant School operated for one year somewhat under capacity. In the following nine years it again operated in excess of capacity. During all of those nine years, Washington School was operating under capacity; in all except three of those years, Jefferson was operated under capacity; and in all except four of those years, Taft was operating under capacity. Although it was standard practice for the school district to transfer students in schools which were overcrowded to adjacent schools, the record is clear that no transfers from Grant to any other school were ever permitted during the 22 years of overcrowding.[2]

In 1954 and 1955, the year of the decision in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), the Grant School was operating in excess of capacity, while at least two nearby schools were operating under capacity and no transfers were effected. No change in the operation of the Grant School as a black school, as far as administration, faculty and student body was ever made until litigation over the issue of racial segregation was imminent.

## THE LITIGATION YEARS

Starting in the late 1960's the Department of Health, Education and Welfare began seeking desegregation of the Grant School. After efforts to secure voluntary compliance had failed, in 1969 HEW filed the fund termination suit previously referred to against the Ferndale School District. As a result of the 1973 denial of certiorari by the Supreme Court of Ferndale's attempt to gain review of this court's affirmance of the HEW decision cutting off Ferndale funds, the Ferndale School District lost its entitlement to a federal allocation of approximately a quarter of a million dollars. After many school board meetings at which desegregation plans applicable to the Grant School were proposed but never approved, an "open enrollment" plan was placed in effect for the beginning of the academic year 1974–1975. In the preceding year Grant School had an enrollment of 280 black students and no white students. In 1974–1975 Grant School enrolled 262 black students and no white students. In November of 1974 the Department of Justice notified the Ferndale School Board that it planned to file a desegregation suit concerning the Grant School. At a meeting with the Ferndale School District, the Justice Department informed the Ferndale School District that the District would have to establish an effective desegregation plan by the week of February 10, 1975, if it desired to avoid the HEW desegregation suit. As a consequence, the Board convened a special meeting for Monday, February 10, 1975.

In the preceding fall, a group of parents had proposed a plan to the Ferndale School District for the creation of what they termed an "open school." This proposal contemplated four classrooms of some Ferndale School District school to be dedicated to an open school program. The essential

---

2. We have summarized the capacity figures in Appendix D attached.

aspect of the open school plan was that children enrolled therein would be allowed to progress in their studies in accordance with their individual abilities rather than being required to adhere to the lesson plans for an entire class. The open school proposal had been made without any relation to the Grant School. On February 10, 1975, however, the Board decided to implement the open school proposal *at the Grant School*, with a view thereby to create an influx of white students into the physical confines of the Grant School. In February of 1975 the Board formally decided to place the open school program in effect at Grant during the 1975–1976 school year. The traditional classroom program at Grant was to continue. The results may be seen in the following statistics drawn from the record of this trial:

|  | Traditional Program | Open Classroom |
|---|---|---|
| 1975–1976 | Students: 208 black 0 white | Students: 30 black 160 white |
|  | Teachers: 7 black 2 white | Teachers: 0 black 6.5 white |
|  | Administrator: 1 black | Administrator: 1 white |
| 1976–1977 | Students: 182 black 0 white | Students: 34 black 181 white |
|  | Teachers: 4 black 4 white | Teachers: 0 black 8 white |
| 1977–1978 | Students: 198 black 1 white | Students: 31 black 176 white |
|  | Teachers: 4 black 3 white | Teachers: 8 white 0 black |

## DECISION

From the beginning of this record to its end, there is strong evidence that the decisions of the Ferndale School Board in relation to building a school in the Forest Grove and Detroyal subdivisions and restricting its attendance were racially motivated. The choice of the name for the school cannot be disregarded, nor can the fact that the boundaries for the mandatory attendance district for the Grant School were fixed by the city limits of Detroit at the south and school district limits of Oak Park on the west and the limits of Ferndale subdivisions which were restricted to white occupancy on the north and east. All this is shown in Appendix C attached.

The obvious result, and on this record we must and do find the intended result, was that, with the exception of one white child in the first year, the Grant School opened all black, and remained all black through the school year 1974–1975. We cannot appropriately ignore the fact that prior to the two years of 1925 and 1926 in which Grant School was planned and opened, parents had the choice of sending their children to any school in the Ferndale School District, but that option ended with the events of 1925 and 1926 (as described above). Nor can we ignore the fact that no black school teachers had ever taught in the Ferndale School District, but that for the Grant School five black school teachers were employed. Nor can we ignore the fact that when the Grant School was opened and for 14 years thereafter, it was administered by the principal of the Jefferson School, a shared administration which never was employed in any other two schools in the history of the Ferndale School District. Nor can we appropriately ignore the many years when Grant School was overcrowded and nearby white schools were under capacity, but contrary to District policy, no transfers from Grant were ever made.

If there were doubts about the meaning of these events, there is evidence other than the historic facts and obvious results to offer explanations for the origination and operation of the Grant School. We believe that three quotations from this record serve to shed additional light. In the fall of 1927, Superintendent Down described the Grant School in a local newspaper as follows:

"The Grant School is located between the Eight Mile Road and North End Avenue, about a block east of Wyoming and is a new six-room building. This school is unique in that the entire enrollment is made up of colored children who are

taught by colored teachers. A very fine loyal spirit has been built up in this school and the splendid work of the colored teachers has been complimented by many who have visited this school."

In 1941 the same Superintendent explained the reasons for not transferring students from Grant to Jefferson when Grant was overcrowded and Jefferson had space available:

You will note by reference to the number of pupils in the Jefferson School and remembering the fact that it is a twelve room building, that it would be possible to take the fifth and sixth grade into that building. There are some things though that we should take into consideration. It would not be satisfactory to the colored group, in spite of the fact that the committee might agree to it, that they should be put into the Jefferson School as a separate grade by themselves. Also I think there would be a matter of legality. If they were put into the Jefferson School as an all colored grade where there are the same grades of white children and separated in rooms, it would be a pure case of segregation. Therefore, I believe under the statutes of Michigan that would be illegal. That would mean mixing of the grades in the Jefferson School. Before the Grant School was built, this district went through a period of turmoil because there were a large number of children in the Grant section in the Jefferson School.

Someone may suggest putting them in the Taft School where we already have 7th and 8th grade children from that section. The Board is well aware of the attitude down in the Taft section because of that situation. When the Grant School opened, the 7th and 8th grades were in the high school. When we started to draw off the 7th and 8th grades from the high school, the Taft building was the first one to have a seventh and eighth grade, therefore, the pupils of the Grant School were taken into the Taft School and it has seemed the prudent thing not to undertake to change.

It is my opinion that the Grant School has been given particular consideration. In the first place it is the only building to be built in this district to my knowledge in which every piece of furniture was absolutely new, every book and every article of supplies were new when the building was opened. The school has constantly had a pupil teacher ratio as low or lower than other elementary schools. It has constantly had teachers where average salary was as high or higher than those in the other schools. It have [sic] everything that the other schools have had and more, except that it has grown and has somewhat of a crowded condition. However, you will note that there is only one more pupil in the school at the end of October, 1940, than there was at the end of October, 1937. In other words in the past four years the membership has increased one.

It is my opinion that the present arrangement is about as good as it can be worked out in that school. I would not recommend the disruption of the Jefferson School or the Taft School, by changing and putting two grades from the Grant School in either the Jefferson or Taft Schools. So much for the Grant School situation. Of course, I might add that the amount that is paid in taxes by that group is very small. This, however, could not be a consideration for not giving equal advantages.

In 1944 Superintendent Down commented on the difficulties which he had in getting qualified "colored teachers." The Superintendent said:

Probably I place my standards to [sic] high, but I am beginning to realize that teachers are not the standard on the average of our white teachers. Probably they come from much the same surroundings as the children. Although we pay the same, we are finding it more and more difficult to get a good quality teacher. The first teachers in the Grant School seem to be a much better type. I am afraid that the next year we may not even be able to get certified colored teachers. Mr. Ford the principal is not

strong. He has many admirable qualities, but he does not have the experience and back ground [sic] our other principals have. I am sure we could do much worse if we tried to get another colored principal because there is a lack of back ground [sic] and experience among the colored. I am not sure about this and I expect it could be denied by the colored teachers but they seem to be more cooperative when working under a white principal than under one of their own race.

We now repeat the five critical findings of fact and law entered by the District Judge after trial of this case in order to apply to them what we believe to be controlling constitutional principles as established in the decisions of the Supreme Court of the United States:

1) The actions of the Ferndale School District in 1925 and 1926 in building the Grant School and in defining its attendance boundaries with the effect of moving all black children from Jefferson into Grant were found by the District Judge to be racially "neutral" actions in spite of the fact that she also found as a fact that the preceding "turmoil" at Jefferson School in 1925 was "racial turmoil."

2) The action of the Ferndale School District in recruiting an entire new staff of five black teachers for the Grant School was found to be a racially discriminatory and unconstitutional act.

3) The District Judge also found, however, that the effect of this action had been dissipated to a degree that required no remedy other than reassignment of the remaining black teachers.

4) The actions of the Ferndale School District in freely arranging transfers from overcrowded white schools to other white schools with excess capacity while refusing to relieve the overcrowding of the Grant School in 1940–1941 by transfers was found to be an act of unconstitutional segregation.

5) Finally, the District Judge found that the effect of this policy had been dissipated completely by the time of trial.

We hold on the record of this lengthy litigation that the District Judge's findings that the building of Grant School and definition of its attendance boundaries by the Ferndale School District were "neutral" applications of its "neighborhood school" policies are clearly erroneous. We recognize, of course, that when the Ferndale School District Board took the measures it did to define attendance zones and to build the Grant School, that it had reason to feel it was complying fully with the then accepted "separate but equal" doctrine of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896). Superintendent Down's public acclaim for his fine colored students, fine colored teachers and fine colored school was perfectly consistent with the Supreme Court's interpretation of the Fourteenth Amendment as of 1925 and 1926. The same may, however, be said of at least some of the racially separate school systems created by statutes adopted by the former Confederate states which were invalidated by the Supreme Court in *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

We shall not detail the facts previously stated in this opinion (on all of which we rely), but would like particularly to emphasize two points in relation to this determination. The first point is that there was simply too much evidence of racial concern about the "turmoil" at Jefferson School to ignore or deny it as having played a major role in the decision to build that school at the time when it was built. The District Judge found that the reference to turmoil at Jefferson in 1925 was a reference to "racial turmoil," but failed to accord this finding its appropriate significance. Second, the fixing of the attendance boundaries for the new school on the exact boundaries of the only one-half mile square area in the district which this record shows was unrestricted as to race could not have been sheer happenstance.[3] If there was more

<hr/>

**3.** Pursuant to a request from the Office of the General Counsel of the Department of Health, Education and Welfare, the Lawyers Title Insurance Corporation conducted a title search of

proof needed about why the northern and eastern boundaries were drawn, it is surely supplied by the fact that in the subsequent history of the Grant School, Grant operated with an entirely black student body, with the one exception of one white child for one year.

The District Judge said that no alternatives to the building of the Grant School were presented. Obviously, however, many were available to the Ferndale School District at the time it made its decision. In the first place, Jefferson itself was a brand new school which was operating substantially under capacity at the time the decision to build Grant was made. It and the Washington and Ridgewood Schools were all within walking distance of the area concerned. Each or all of them could have provided continuing integrative solutions to the problems at least for several years. Jefferson and Washington could have expanded to meet the population growth.

Additionally, the northern boundary of the Grant School clearly did not have to be established where it was. If there had ever been a desire to avoid *absolute* segregation, it could have been located farther north or farther south. To some degree, the same could be said of the eastern boundary which, however, might be regarded as largely influenced or controlled by major public and industrial usages.

Chief Justice Burger, for a unanimous Court, wrote in *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971):

> The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation.

*Id.* at 15, 91 S.Ct. at 1275.

Assuredly, there are "vestiges of state-imposed segregation" to be eliminated here.

The Chief Justice at another point said:

> In *Green* [*v. County School Board,* 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716], we pointed out that existing policy and practice with regard to faculty, staff, transportation, extra-curricular activities, and facilities were among the most important indicia of a segregated system. 391 U.S., at 435 [, 88 S.Ct. at 1692], Inde-

property located in Section 33, Royal Oak Township, Oakland County, Michigan, which included lands lying within the corporation limits of the City of Ferndale and the City of Oak Park. That title search developed information identifying subdivisions within the Ferndale School District which were racially restricted. The results of the search were introduced before the Hearing Examiner in the 1969 fund termination proceeding as government exhibits G–145 and G–146. The District Judge adopted the fund termination record as part of the record in the instant case. Appendices B and C of the government's brief before the Hearing Examiner neatly summarize the results of the title search by the Lawyers Title Insurance Corporation of the Section 33 properties.

Included in the Fund Termination case record before the District Court were these findings of fact by the Hearing Examiner:

32. The basis for assignment to the Grant School was primarily race and the residential area of the black children.

33. The School District designed the Grant School just large enough to fit the neighborhood that it contemplated for purposes of school attendance, and the black student body immediately expected.

34. The Board was aware of the racial boundaries in the development of residential subdivisions in the District.

\* \* \* \* \* \*

68. The preponderance of the evidence indicates that the neighborhood served by the Grant School was known as a residential area primarily for blacks at the time the school was authorized in 1925, and that the Board knew that the Grant area was being developed for black residents at that time.

69. The white residents of the Grant area moved out after the Grant School was opened.

70. Racially restrictive covenants on land were enforceable in Michigan courts and were actually enforced in Oakland County. Racial covenants continued to be enforceable by the Michigan courts until 1948.

71. Racial covenants were widely used in the School District, particularly in newly developing subdivisions, to exclude black residents.

72. On the borders of the Grant area or in the immediate vicinity, several of the subdivisions were racially restricted as a matter of record, according to a general plan. In other subdivisions, although the land records reveal no filing of a general plan, the deeds for the first sale of land from the subdivisions contain racial restrictions.

pendent of student assignment, where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, the quality of school buildings and equipment, or the organization of sports activities, a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown. *Id.* at 18, 91 S.Ct. at 1277.

Measured against these standards, it is simply impossible for us to say that the decision of the Ferndale School District to build the Grant School, named after Ulysses S. Grant, staff it with exclusively black teachers, and to draw the boundaries so that it had, as indicated above, an exclusively black student body was in anywise "neutral" in relation to the application of racially equal enforcement of the law in the educational system of the Ferndale School District.

We find as a fact from this record that applying the constitutional standards of *Brown v. Board of Education, supra,* and such cases as *Swann v. Charlotte-Mecklenburg Board of Education, supra,* the creation of the Grant School was motivated by racial reasons and was intentionally segregative in purpose and effect.

We likewise hold that the District Judge's findings that any segregative impact from the original provision of an all black faculty for the Grant School had been dissipated was clearly erroneous. The same "clearly erroneous" holding must be entered in relation to her findings that the effects of the Ferndale School District's refusal to follow its standard policy of transferring students from overcrowded Grant to nearby white schools had been similarly dissipated. We see no logic at all to the dissipation findings when, in fact, the Grant School admittedly had functioned as an all black school[4] as far as student body is concerned from the year after its opening to the present day, as far as its traditional classroom program is concerned, and functioned with an all black faculty from its opening to 1964, and then with a great majority of black faculty until the 1976–1977 year. In short, we view the

record as presenting conclusive evidence, and we find as facts that the Grant School was built to be a black school, in violation of the Constitution of the United States (as presently interpreted) and has been intentionally operated as such in the intervening years, including 1954 when *Brown v. Board of Education, supra,* was decided and 1973 when *Keyes v. School District No. 1* (Denver), 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), was decided.

In *Keyes,* the opinion of the Court said: Nevertheless, where plaintiffs prove that the school authorities have carried out a systematic program of segregation affecting a substantial portion of the students, schools, teachers, and facilities within the school system, it is only common sense to conclude that there exists a predicate for a finding of the existence of a dual school system. Several considerations support this conclusion. First, it is obvious that a practice of concentrating Negroes in certain schools by structuring attendance zones or designating "feeder" schools on the basis of race has the reciprocal effect of keeping other nearby schools predominantly white. Similarly, the practice of building a school—such as the Barrett Elementary School in this case—to a certain size and in a certain location, "with conscious knowledge that it would be a segregated school," 303 F.Supp. [279,] at 285, has a substantial reciprocal effect on the racial composition of other nearby schools.

*Id.* at 201–202, 93 S.Ct. at 2694 (footnote omitted).

In this case the effect of the original segregative purposes have not been dissipated at all; indeed, the continued segregative purpose of the Ferndale School District Board has continued down to and through the date of the District Court trial.

The plaintiffs in this case have clearly demonstrated a "causal nexus between intentional segregative actions and the conditions they seek to remedy." *Columbus Board of Education v. Penick,* 99 S.Ct. at 2958 (Mr. Justice Rehnquist, dissenting).

---

4. Excepting one white child for the year 1926.

Turning now to what we believe to be firmly established desegregation law, we find that as of 1926, as of 1954, and as of 1973, the Ferndale School District, because in each of those years it was intentionally operating an all black school which had a major segregative impact upon that school, as well as on many or all of the other schools of the Ferndale School District, was under a continuing duty to accomplish desegregation of the Grant School, which it has consistently failed and refused to do.

In this regard we feel it appropriate to quote the dispositive paragraphs of Justice White's opinion for the Court in the *Columbus* case, both as authority for our intentional segregation findings above and as controlling law on remedy for consideration of the District Court on remand:

It is also urged that the District Court and the Court of Appeals failed to observe the requirements of our recent decision in *Dayton I*, which reiterated the accepted rule that the remedy imposed by a court of equity should be commensurate with the violation ascertained, and held that the remedy for the violations that had then been established in that case should be aimed at rectifying the "incremental segregative effect" of the discriminatory acts identified. In *Dayton I*, only a few apparently isolated discriminatory practices has been found; yet a systemwide remedy had been imposed without proof of a systemwide impact. Here, however, the District Court repeatedly emphasized that it had found purposefully segregative practices with current, systemwide impact. 429 F.Supp. [229], at 252, 259–260, 264, 266; Pet.App. 95; 583 F.2d [787], at 799. And the Court of Appeals, responding to similar arguments, said:

"School board policies of systemwide application necessarily have systemwide impact. 1) The pre-1954 policy of creating an enclave of five schools intentionally designed for black students and known as 'black' schools, as found by the District Judge, clearly had a 'substantial'—indeed, a systemwide— impact. 2) The post-1954 failure of the Columbus Board to desegregate the school system in spite of many requests and demands to do so, of course, had a systemwide impact. 3) So, too, did the Columbus Board's segregative school construction and siting policy as we have detailed it above. 4) So too did its student assignment policy which, as shown above, produced the large majority of racially identifiable schools as of the school year 1975–1976. 5) The practice of assigning black teachers and administrators only or in large majority to black schools likewise represented a systemwide policy of segregation. This policy served until July 1974 to deprive black students of opportunities for contact with and learning from white teachers, and conversely to deprive white students of similar opportunities to meet, know and learn from black teachers. It also served as discriminatory, systemwide racial identification of schools." 583 F.2d, at 814.

Nor do we perceive any misuse of *Keyes*, where we held that purposeful discrimination in a substantial part of a school system furnishes a sufficient basis for an inferential finding of a systemwide discriminatory intent unless otherwise rebutted, and that given the purpose to operate a dual school system one could infer a connection between such a purpose and racial separation in other parts of the school system. There was no undue reliance here on the inferences permitted by *Keyes*, or upon those recognized by *Swann*. Furthermore, the Board was given ample opportunity to counter the evidence of segregative purpose and current, systemwide impact, and the findings of the courts below were against it in both respects. 429 F.Supp., at 260; Pet.App. 95, 102, 105.

*Columbus Board of Education v. Penick*, 99 S.Ct. at 2950–52.

We recognize, of course, two significant distinctions between our instant case and the case dealt with in the language just quoted. The first is that the District Judge, as we have outlined above, did not

find continuing segregative effect from the unconstitutional practices she did find, and, of course, did not find systemwide impact from those practices. While we have reversed her on her finding of no continuing effect for the reasons outlined above, we feel it appropriate for the issue of systemwide impact and the question of remedy to be remanded to the District Court for further consideration. Within the small geographical boundaries of this school district, the District Court should find a feasible desegregation plan sufficient to accomplish the wiping out of all vestiges of unconstitutional segregation relatively easy to define. In that regard, however, it should require the Ferndale School District Board in the first instance to propose remedial measures needed to accomplish wiping out the vestiges of segregation in the Ferndale School District—"root and branch."

■ Since on review of this appeal concerning the State defendants we find no merit to the contention that they had not received adequate notice, the District Court judgment as to the State defendants is likewise reversed.[5]

The judgment of the District Court is vacated. The case is remanded to the District Court for further proceedings consistent with this opinion.

### APPENDIX A

### UNITED STATES v. SCHOOL DIST. OF FERNDALE

Before EDWARDS, CELEBREZZE and LIVELY, Circuit Judges.

CELEBREZZE, Circuit Judge.

The School District of the City of Ferndale, Michigan, covers a small suburban area immediately north of Detroit. Approximately fifty years ago, the local school board ordered construction of the U. S. Grant elementary school in the southwest corner of the district. The attendance area for Grant was carved out of that for the Thomas Jefferson elementary school, an institution with a predominantly white student body located approximately one-half mile from the Grant school site. The first class of students at Grant was entirely black, save for one student.

There is little dispute that, at least until 1975, Grant remained overwhelmingly black. Between 1968 and 1974, no white students attended Grant. During the same period the Grant faculty was predominantly and sometimes entirely black. Of the other nine elementary schools in the district, all have overwhelmingly white student and faculty populations.

\* \* \* \* \* \*

In 1969, the United States Department of Health, Education and Welfare (HEW) instituted administrative proceedings against the school district under Title VI of the Civil Rights Act of 1964. That statute permits federal agencies to cut off financial assistance to state programs that subject persons to racial discrimination. 42 U.S.C. §§ 2000d, 2000d–1. After extensive hearings, an HEW hearing examiner ordered termination of all HEW aid to the school district.

\* \* \* \* \* \*

This fund termination order was affirmed by a Reviewing Authority at HEW, and a petition for review was subsequently denied by the Secretary of HEW. On March 1, 1973, this Court affirmed the fund termination order, finding that it was supported by substantial evidence. *School Dist. of City of Ferndale v. H. E. W.*, 474 F.2d 1349 (6th Cir.) (unpublished order), *cert. den.*, 414 U.S. 824, 94 S.Ct. 126, 38 L.Ed.2d 57 (1973).

---

5. We have reviewed the District Judge's oral opinion delivered from the bench granting summary judgment to the State of Michigan for want of adequate notice under 20 U.S.C. § 1710 (1976). The prior opinion of this court (*See* Judge Celebrezze's opinion, 577 F.2d 1339, 1348–9 (6th Cir. 1978), Appendix A) made clear that the State of Michigan was on notice of the claims by the United States that Ferndale has been operating an intentionally racially segregated school at the Grant School. Further, we view the letters presented to the District Court on remand as complying with 20 U.S.C. § 1710 (1976), (*See particularly* App.Vol. V, pp. 943–953) and find therein ample notice of the constitutional violations served on the Governor (a member of the State Board of Education) in ample time for the State of Michigan to have taken curative measures. No more notice is required.

After the cutoff of federal funds, Ferndale school officials instituted two educational programs at Grant school for 1975–76 and 1976–77 school years: 1) A traditional academic program for Grant students in grades kindergarten through six; 2) An "open classroom" program for other students in grades kindergarten through six. The open classroom approach differs from the traditional program in that it is less structured, and allows for more individualized treatment of students. The program was open to all elementary students in the district on a voluntary basis. In addition to the changes at Grant, the school district implemented an "open enrollment" or freedom of choice plan under which black students residing in the Grant attendance area were provided the choice of attending any other elementary school in the Ferndale school district.

These programs produced the following attendance figures for the 1975–76 school year.[2]

**Grant School**

| Traditional Program | Open Classroom |
| --- | --- |
| 230 black (approx) | 31 black |
| 0 white | 169 white |
| 230 total | 200 total |

The two programs at Grant, while housed in the same building, were conducted in separate classrooms. Only seven black students in the Grant attendance area elected the freedom of choice option for the 1975–76 school year.

Projected faculty composition at Grant for the 1975–76 school year was as follows:

| Traditional Program | Open Classroom |
| --- | --- |
| Teachers: | Teachers: |
| 7 black | 0 black |
| 3 white | 7.5 white |
| 10 total | 7.5 total |

The school district projected a total of eight teachers in the traditional program for 1976–77: four black and four white.

In the spring of 1975, the United States filed a desegregation suit against the Ferndale School District under the Equal Educational Opportunities Act of 1974 (EEOA or the Act), 20 U.S.C. §§ 1701–1758. The complaint alleged, *inter alia*, that the Grant school had been illegally maintained as a racially segregated institution. Approximately one year later, the United States filed a second desegregation suit based on similar allegations, but this time under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6. Both of these actions are now before this Court on interlocutory appeals filed by the United States. Because the cases involve a common factual basis, we have consolidated them for purposes of review.

**I. EEOA SUIT**

The EEOA action was brought under a provision of the Act that permits the Attorney General to institute a civil action in the name of the United States on behalf of individuals denied "equal educational opportunity" as defined in the Act. 20 U.S.C. § 1706. Under that definition, an educational agency is prohibited from deliberately segregating students on the basis of race or failing to take affirmative steps to eliminate the vestiges of a dual school system. 20 U.S.C. §§ 1703(a) and (b). The Act also generally prohibits racial discrimination in the employment or assignment of faculty or staff. 20 U.S.C. § 1703(d).

The Attorney General's complaint named as defendants the School District of the City of Ferndale, members of the Ferndale Board of Education, and the Superintendent of the school district (local defendants). Also named as defendants were the State of Michigan, the Governor of Michigan, the Michigan State Board of Education, and the

---

2. Figures are based on stipulated projections made by parties to this case prior to the start of the 1975–76 school year.

Michigan Superintendent of Public Instruction (State defendants).[3]

The proceedings in the District Court have been fully reported, and need not be recited here. *United States v. School District of Ferndale,* 400 F.Supp. 1122 & 1131 & 1135 & 1141 (E.D.Mich.1975) (4 opinions). Suffice it to say that the District Court dismissed the EEOA claims on various grounds, and simultaneously denied a motion for summary judgment by the United States.[4] The District Court has certified these rulings for interlocutory appeal under 28 U.S.C. § 1292(b).

## A. Dismissal of EEOA Allegations for Failure to Specify Individuals Represented

The first ruling appealed is the dismissal of the EEOA allegations in the complaint[5] for failure to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 12(b)(6). The District Court held that the complaint did not comply with the following EEOA provision:

> An individual denied an equal educational opportunity, as defined by this subchapter may institute a civil action in an appropriate district court of the United States against such parties, and for such relief, as may be appropriate. The Attorney General of the United States (hereinafter in this chapter referred to as the "Attorney General"), for or in the name of the United States, may also institute such a civil action *on behalf* of such an individual.

20 .U.S.C. § 1706 (emphasis supplied). In particular, the Court ruled that the complaint did not adequately identify those per-

sons "on whose behalf" the action was being brought by the Attorney General. Although the actual naming of individuals was not required, the Court felt that the statute demanded at least enough specificity to make it " 'administratively feasible for the court to determine whether a particular individual' " was a member of the group being represented. 400 F.Supp. at 1128, *quoting* 7 Wright & Miller, Federal Prac. & Proced. § 1760 at 581.

\*    \*    \*    \*    \*    \*

Upon review of the complaint we think it is abundantly clear "on whose behalf" the suit is brought. The complaint expressly identifies "the black students in attendance at the public elementary schools of the defendant school district" as individuals represented.[6] It alleges that those students have been denied equal educational opportunity by virtue of the school district's operation and maintenance of Grant school as a racially segregated institution. The averments leave little question as to what the United States is complaining about and whose rights it is attempting to vindicate. *See United States v. Greenwood Municipal School Dist.,* 406 F.2d 1086, 1090 (5th Cir.), *cert. den.,* 395 U.S. 907, 89 S.Ct. 1749, 23 L.Ed.2d 220 (1969).

\*    \*    \*    \*    \*    \*

In any event, we find nothing in the EEOA that requires the specificity of allegation required by the District Court. The statute permits the Attorney General to bring an action "on behalf of *an* individual denied equal educational opportunity"; it does not require identification of *all* actual or potential victims of such denials. As

---

**3.** In addition to the EEOA claim, the complaint alleged violation of the Federal Revenue Sharing Act, 31 U.S.C. §§ 1221, *et seq.,* by several of the State defendants. The Revenue Sharing allegations are not at issue in this appeal.

**4.** The District Court reached the summary judgment motion only because it dismissed the EEOA claims with leave to amend. 400 F.Supp. at 1143.

**5.** The original complaint was dismissed with leave to amend. 400 F.Supp. 1122. The United States subsequently filed an amended com-

plaint. "The complaint," as used herein refers to the amended complaint only.

**6.** The complaint also identifies the black faculty and staff of the elementary schools as persons represented. The District Court properly discounted this claim. 400 F.Supp. at 1128–29. Although racial discrimination with regard to faculty may well constitute a violation of the EEOA (*see* 20 U.S.C. § 1703(d)), the Act's protection is provided for the direct benefit of students rather than teachers. *See* 20 U.S.C. § 1701(a)(1).

long as there is at least one person arguably denied equal educational opportunity, the statutory requirement is met.[8] We see no reason to read into the statute a pleading rule not specified by Congress that can only have the effect of impeding enforcement of the Act.[9] Such a construction would also be inconsistent with Federal Rule of Civil Procedure 8, which requires "simple, concise, and direct" averments, and which mandates that pleadings "be so construed as to do substantial justice."

Accordingly the judgment of the District Court dismissing the EEOA allegations is reversed.

\* \* \* \* \* \*

## C. Dismissal of State Defendants

The government's complaint includes the following allegations relevant to the State defendants:

12. Since the initiation of administrative proceedings by HEW in 1969, the State defendants have known that the Ferndale elementary schools were being operated by the defendants local school authorities on a racially segregated and discriminatory basis.

13. The State defendants, notwithstanding their knowledge that the Ferndale elementary schools were being operated by defendant local school authorities on a racially segregated and discriminatory basis, have nevertheless continued to aid and assist the perpetuation and maintenance of that racial segregation and discrimination through the provisions of state funds and other assistance, while failing and refusing to take any necessary or appropriate action to bring the operation of the Ferndale elementary schools into compliance with the Four-

teenth Amendment to the United States Constitution.

14. The defendants continue to operate, permit, aid, and assist the operation of the elementary schools in the defendant school district on a racially segregated and discriminatory basis.

\* \* \* \* \* \*

18. The actions and inactions of the defendants, as described in paragraphs 9 and 12 through 17 above, deny equal protection of the laws and equal educational opportunity to black students and black faculty and staff in the elementary schools in Ferndale in violation of 20 U.S.C. § 1703(a), (b) and (d) and the Fourteenth Amendment to the Constitution of the United States.

Shortly after the United States filed these allegations, the State defendants filed a motion to dismiss the EEOA claims against them for failure to state a claim upon which relief can be granted. Federal Rule of Civil Procedure 12(b)(6). The District Court granted the motion holding that the acts allegedly committed by the State defendants, even if proven, would not constitute violation of the following EEOA proscriptions relied on by the United States:

No State shall deny equal educational opportunity to an individual on account of his or her race, color, sex, or national origin, by—

(a) the deliberate segregation by an educational agency of students on the basis of race, color, or national origin among or within schools;

(b) the failure of an educational agency which has formerly practiced such deliberate segregation to take af-

---

8. Congress clearly contemplated a broad role for the Attorney General in enforcing the remedial provisions of the EEOA. Not only is he permitted to file suit on behalf of an individual, but he may also intervene in any action initially brought by an individual under the statute. 20 U.S.C. § 1709. Moreover, he need not await receipt of a written complaint from the individual as is required for desegregation suits by the Attorney General under Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6.

9. The District Court suggested that specificity was required in the complaint because the EEOA's purpose was to vindicate "the individual rights of those discriminated against" as opposed to a "national policy of school desegregation." 400 F.Supp. at 1128. This reading is totally inconsistent with the Act's statement of purpose: "[to] specify appropriate remedies for the elimination of the vestiges of dual school *systems.*" 20 U.S.C. § 1702(b) (emphasis supplied).

firmative steps, consistent with part 4 of this subchapter, to remove the vestiges of a dual school system;

\* \* \* \* \* \*

(d) discrimination by an educational agency on the basis of race, color, or national origin in the employment, employment conditions, or assignment to schools of its faculty or staff, except to fulfill the purposes of subsection (f) below;

20 U.S.C. § 1703.

The District Court ruled that the State could not be held culpable under these provisions because it was not the "educational agency"[13] that allegedly committed the proscribed discriminatory acts. 400 F.Supp. at 1138. The gravamen of the complaint against the State defendants is not that they directly engaged in discriminatory assignment of students and teachers, but that they tolerated and provided assistance to a local school district which they knew to be engaging in such practices. The District Court apparently felt that the statute applied only to direct acts of discrimination, not to indirect assistance to districts violating the Act.

We do not believe that the State can escape liability under the Act merely because its support for the proscribed actions was indirect.[14]

\* \* \* \* \* \*

We seriously doubt that Congress intended to allow states to bankroll dual school systems, while enacting a statute specifying remedies for the *elimination* of such systems. *See* 20 U.S.C. § 1702(b).

We note also that the EEOA authorizes the Attorney General to seek relief "against such parties . . . as may be appropriate." 20 U.S.C. § 1706. It is particularly "appropriate" that the State defendants be participants in this litigation, since their authority over the local district may well require their involvement in any remedial

action that might be required. *See Brinkman v. Gilligan*, 503 F.2d 684, 704 (6th Cir. 1974). *Cf. Bradley v. Milliken*, 540 F.2d 229, 242–45 (6th Cir. 1976), *aff'd* 433 U.S. 267, 97 S.Ct. 380, 50 L.Ed.2d 325 (1977).

As an alternative ground for dismissing the EEOA claims against the State defendants, the District Court held that the Attorney General had failed to meet the following statutory prerequisites to suit as to the State defendants:

The Attorney General shall not institute a civil action under section 1706 of this title before he—

(a) gives to the appropriate educational agency notice of the condition or conditions which, in his judgment, constitute a violation of part 2 of this subchapter; and

(b) certifies to the appropriate district court of the United States that he is satisfied that such educational agency has not, within a reasonable time after such notice, undertaken appropriate remedial action.

20 U.S.C. § 1710.

The District Court found that the certificate filed by the Attorney General under subsection (b) "indicate[d] that the local school authorities, but not the State defendants, had been notified." The Court therefore held that the Attorney General had failed to state a claim against the State defendants.

The Attorney General's certificate, which was appended to and referenced in the complaint reads as follows:

### CERTIFICATE OF THE ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA

Edward H. Levi, Attorney General of the United States of America, certifies that, pursuant to Section 211 of the Equal Educational Opportunities Act of 1974, I have, through the Assistant Attor-

---

**13.** Under the Act, "educational agency" is defined as "a local educational agency or a 'State educational agency.'" 20 U.S.C. § 1720(a).

**14.** The legislative history of the EEOA is of little assistance on this issue. *See* 1974 U.S. Code Cong. & Admin.News, p. 4093. *See generally* 400 F.Supp. at 1126.

ney General of the Civil Rights Division, given the appropriate educational agencies notice of the conditions which, in my judgment, constitute a denial of an equal educational opportunity on account of race in the School District of the City of Ferndale, Michigan, and I am satisfied that the educational agencies have not undertaken the appropriate and necessary remedial action within a reasonable time after such notice was given.

Signed this 11th day of July, 1975.
/s/ EDWARD H. LEVI
Attorney General

We do not see how the District Court read this certificate as indicting that only the local school authorities had been notified. The certificate clearly states that the Attorney General has "given the appropriate educational *agencies* notice." (emphasis supplied). Had only the local agency been notified, presumably the singular would have been used. The complaint plainly alleges that the proper steps were taken, and this was sufficient to withstand dismissal for failure to state a claim under Rule 12(b)(6). *See also* Rule 8.

Accordingly, the judgment of the District Court dismissing Count I of the Complaint against the State defendants is reversed.

\* \* \* \* \* \*

**E. Disposition**

The EEOA suit is remanded to the District Court for further proceedings consistent with this opinion.

\* \* \* \* \* \*

## II. TITLE IV SUIT

The second suit was brought pursuant to Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6, which authorizes the Attorney General to initiate desegregation actions in specified circumstances, based on alleged denials of equal protection of the laws by school boards. The Title IV complaint contains factual allegations similar to those in the EEOA complaint [18] and includes a request for a permanent injunction against operation of the Ferndale schools in a racially discriminatory manner.

Several months after filing the complaint, the United States moved for a preliminary injunction directing the local school district to develop and implement a desegregation plan in time for the 1976–77 school year. After presentation of evidence by the United States at a hearing on the motion, the defendant Ferndale School Board [19] requested that the motion be denied without presentation of evidence by the defense. Thereupon the District Court denied the motion for a preliminary injunction. The United States appeals pursuant to 28 U.S.C. § 1292(a)(1), arguing that the District Court's decision is based on erroneous conclusions of law and is tainted by improper evidentiary rulings at the preliminary injunction hearing.

Ordinarily, the grant or denial of injunctive relief by a District Court is reviewable only for abuse of discretion. *See, e. g., S. E. C. v. Senex Corp.,* 534 F.2d 1240, 1241 (6th Cir. 1976). Improper application of the law, however, is itself an abuse of discretion. *Clemons v. Board of Ed. of Hillsboro,* 228 F.2d 853, 857 (6th Cir.), *cert. den.,* 350 U.S. 1006, 76 S.Ct. 651, 100 L.Ed. 868 (1956). An appellate court may reverse if the decision below was based on an erroneous view of the law, or if procedural error intervened in the proceedings. *See* 11 Wright & Miller, *Federal Prac. & Proced.* § 2962 at 636–38 (1973). Accordingly, we think it appropriate to consider the claims of legal error asserted by the United States.

---

**18.** The Title IV complaint names fewer defendants than the EEOA complaint. The Title IV defendants are the School District of the City of Ferndale, the Superintendent of the School District, the State of Michigan, the Michigan State Board of Education, and the Michigan Superintendent of Public Instruction.

**19.** Prior to the preliminary injunction hearing, the District Court granted summary judgment to the State defendants dismissing the Title IV complaint against them on procedural grounds without prejudice. The District Court's oral opinion granting summary judgment does not appear in the record. We are thus unable to review it at this time, even if we were to decide that such review is appropriate on an appeal under 28 U.S.C. § 1292(a)(1).

### A. Legal Conclusions

\* \* \* \* \* \*

We have carefully reviewed the decision and agree with the United States that it contains several material errors of law. At the outset, the District Court failed to make an express finding as to probability of success on the merits. Such a finding is important in deciding on whether to grant injunctive relief. *See e. g., S. E. C. v. Senex Corp.*, 534 F.2d 1240, 1241 (6th Cir. 1976). Unless another factor is completely dispositive, we think express findings of fact and conclusions of law on the issue are required by Federal Rule of Civil Procedure 52(a). *See Mayo v. Lakeland Highlands Canning Co.*, 309 U.S. 310, 316, 60 S.Ct. 517, 84 L.Ed. 774 (1940).

Although express findings were not made, the Court appeared to attach significance to the school district's claim that "it has always had a neighborhood school policy." We question the value of this assertion by the school district when unsupported by presentation of evidence below. In any event its legal significance is problematical. The "mere assertion of [a 'neighborhood school'] policy is not dispositive where . . . the school authorities have been found to have practiced *de jure* segregation in a meaningful portion of the school system by techniques that indicate that the 'neighborhood school' concept has not been maintained free of manipulation." *Keyes v. School District No. 1*, 413 U.S. 189, 212, 93 S.Ct. 2686, 2699, 37 L.Ed.2d 548 (1973). *See N. A. A. C. P. v. Lansing Bd. of Ed.*, 559 F.2d 1042, 1049 (6th Cir.), *cert. den.*, 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977). The United States alleges just such "manipulation" in this case.

On the issue of irreparable harm to the Plaintiff the District Court indicated that individual black elementary students could avoid the harm of state imposed segregation by participating in the "open classroom" and "open enrollment" programs recently instituted by the school board. It is well established, however, that "open enrollment" and "freedom of choice" plans correct denial of equal protection of laws to black students only where they effectuate a conversion to "a unitary, non-racial system." *Green v. County School Bd.*, 391 U.S. 430, 441, 88 S.Ct. 1689, 1696, 20 L.Ed.2d 716 (1968). If the United States is correct in its claim that the school district still suffers from state imposed segregation, or the vestiges thereof, the mere availability of open enrollment does not correct the harm. An open enrollment plan that does not eliminate state-imposed segregation "root and branch" merely operates to "burden children and their parents with a responsibility which *Brown II*[20] placed squarely on the School Board." *Green, supra*, 391 U.S. at 441–42, 88 S.Ct. at 1696.

Absent a finding by the District Court that the Ferndale open enrollment plan has removed all vestiges of a dual school system, it was erroneous to conclude that any harm to black students was mitigated by such a plan. It is axiomatic that black students, particularly in the elementary grades, suffer irreparable harm from the maintenance of a segregated school system. *See Brown v. Board of Education*, 347 U.S. 483, 493–95, 74 S.Ct. 686, 691–92, 98 L.Ed. 873 (1954). The constitutional command is that dual school systems be dismantled *at once. Alexander v. Holmes County Bd. of Ed.*, 396 U.S. 19, 20, 90 S.Ct. 29, 24 L.Ed.2d 19 (1969). Surely it cannot be said that movement of seven black elementary students to predominantly white schools fulfills this requirement, where several hundred black elementary students—nearly all of those in the district—remain in one school.[21] Nor can an "open classroom" pro-

---

**20.** *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).

**21.** In the fall of 1976, the local defendants filed a brief with the District Court in which it was claimed that 50 Grant area black students had elected the "open enrollment" option for the 1976–77 school year. The District Court relied on this allegation in denying the preliminary injunction, even though no evidence was offered to support it. Even if the allegation is true, however, approximately 75% of the black elementary students in the District would still be in Grant's segregated traditional program.

gram be considered effective in ending segregation where a substantial number of black students remain in a traditional program separated from white students in the same building.[22]

We also reject the District Court's conclusion that preliminary injunctive relief would necessarily be delayed by the requirements of 20 U.S.C. § 1752. That provision does not affect court efforts to eradicate state-imposed segregation. *Morgan v. Kerrigan*, 523 F.2d 917, 920 (1st Cir. 1975). Section 1752 merely restates the provisions of 20 U.S.C. § 1653 (now expired), which we found inapplicable to an injunction against *de jure* segregation in *N. A. A. C. P. v. Lansing Bd. of Ed.*, 485 F.2d 569, 570 (6th Cir. 1973). *See Newburg Area Council v. Gordon*, 521 F.2d 578, 581 (6th Cir. 1975).

As to the general propriety of preliminary injunctions in school desegregation cases, we have never adopted the view suggested by the District Court that such relief should be ordered only if the plaintiff has prevailed after a full trial of the issues in the case. In both *N. A. A. C. P. v. Lansing Bd. of Ed.*, 485 F.2d 569 (6th Cir. 1973), and *Oliver v. School Dist. of City of Kalamazoo*, 448 F.2d 635 (6th Cir. 1971), we affirmed the issuance of preliminary injunctions ordering implementation of desegregation plans. In neither case had there been a full trial on the merits. Both involved school systems much larger than the one involved here.[23] *See also United States v. School Dist. 151 of Cook County*, 404 F.2d 1125 (7th Cir. 1968), *cert. den.*, 402 U.S. 943, 91 S.Ct. 1610, 29 L.Ed.2d 111 (1971).

Finally, we reject the District Court's conclusion that the "unitary nature" of the Ferndale School system is shown by the fact that "during school years [sic] there have always been a few black students" at elementary schools other than Grant. The

United States does not claim that the school district has by law forbidden white students and black students from attending the same institutions. Rather, the charge is that school officials have deliberately followed policies of student assignment, faculty assignment, school construction and drawing of attendance zones designed to produce segregative results. Such state imposed segregation is no less violative of the Constitution then segregation required by statute. *Keyes v. School Dist. No. 1*, 413 U.S. 189, 201–03, 93 S.Ct. 2686, 2694–95, 37 L.Ed.2d 548 (1973). The fact that a policy of segregation does not succeed in placing every black student in the same school does not make the system unitary; as long as the policy has some segregative effect and that effect or its vestiges remain, the system is still a "dual" one for constitutional purposes. *See Swann v. Bd. of Ed.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed. 554 (1971); *Green v. County Sch. Bd.*, 391 U.S. 430, 437–38, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716 (1968); *Oliver v. Michigan State Bd. of Ed.*, 508 F.2d 178, 182 (6th Cir. 1974).

\*    \*    \*    \*    \*    \*

### C. Disposition

In light of the erroneous conclusions of law and evidentiary rulings discussed above, we cannot affirm the District Court's denial of preliminary injunctive relief. Our view in this regard is fortified by the strength of the case presented. The United States has offered considerable evidence that Grant school was initially established as a black institution. According to the HEW Hearing Examiner, local school officials followed policies in subsequent years designed to maintain Grant's racial makeup. The school district's open classroom and freedom of choice plans have been

---

Under such conditions, Grant would still clearly remain a racially identifiable school.

**22.** *See Boykins v. Fairfield Bd. of Ed.*, 457 F.2d 1091, 1096–97 (5th Cir. 1972), *cert. den.*, 420 U.S. 962, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

**23.** The District Court's reliance on *Village of Arlington Heights v. Metropolitan Housing*

*Devel. Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), is misplaced. The mere fact that the inquiry into discriminatory intent must be a "sensitive" one does not automatically preclude preliminary relief. There is no general rule against granting preliminary relief where questions of intent are material to a disposition on the merits.

ineffective in negating the racially identifiable character of Grant, at least in those years for which statistics are before this Court. Perhaps most significantly, black faculty assignments at Grant have far exceeded the proportion at other elementary schools in the district. Where it is possible to identify a "white school" or a "Negro school" simply by reference to the racial composition of teachers and staff, a prima facie case of violation of substantive constitutional rights under the equal protection clause is shown.[27] *Swann v. Board of Ed.*, 402 U.S. 1, 18, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554.

We are reluctant, however, to decide on the merits of ordering a preliminary injunction when the defendants have yet to present evidence. Accordingly, the judgment of the District Court in the Title IV suit is vacated, and the motion for preliminary injunction remanded for consolidation with trial on the merits, pursuant to Federal Rule of Civil Procedure 65(a)(2). In light of the irreparable harm alleged, the District Court is instructed to schedule trial not more than sixty days from the date of filing of this opinion. Every effort should be made to resolve the issues in this case prior to commencement of the 1978–79 school year. In the interests of facilitating complete relief, we strongly suggest that the EEOA suit be consolidated for trial with the Title IV suit.

\*    \*    \*    \*    \*    \*

## APPENDIX B

We note with interest the testimony of Mrs. Anna Thomas, a member of the black community who had voiced an interest in the Ferndale schools in the early 1920's. Mrs. Thomas objected to the School Board's decision (pursuant to the establishment of school attendance zones) to transfer black students from Ridgewood and Washington Elementary Schools to the newly constructed Jefferson School, since some students living in the Grant area would, as a result of the transfer, be required to walk further to attend Jefferson than would be necessary were they to continue to attend Ridgewood and Washington. Mrs. Thomas brought suit against the School Board, alleging that the establishment of school attendance zones reflected a conscious attempt by the School Board to remove all black children from surrounding schools and to consolidate the population of black students in a single school—the Jefferson School. (See pleading below.) The suit was dismissed.

Mrs. Thomas subsequently opposed the proposed construction of a wooden, temporary school building in the Grant area to service the population of black students who lived in that area. Although her testimony does not convince us that she agreed to the construction of an all black school, it is possible, as the District Judge believed, that she was persuaded to support such a proposition when she was assured that a standard, brick school building was being considered, rather than a temporary structure. Even if we were to assume that Mrs. Thomas favored the construction of a school in the Grant area, and we do not think the record is clear on this point, any expressions of hers would have to be read against the state of the law in 1926, which promised black children no better result than to be provided with separate but equal schools.

Contrary to the view of the District Judge, we find nothing in Mrs. Thomas' testimony which contradicts our finding of intentional segregative purpose on the part of the Ferndale School District when its actions are judged by the constitutional standards of *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), as opposed to the 1926 "separate but equal" standard of *Plessy v. Ferguson*, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896).

---

27. Certainly this was the case at Grant school through the 1974–75 school year. *See* note 1 and accompanying text, *supra.* Even under the school district's projected figures for 1976–77, the traditional program at Grant had a 50% black faculty—far in excess of the normal district-wide percentage.

   *United States v. School Dist. of Ferndale*, 577 F.2d 1339 (6th Cir. 1978).

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE
COUNTY OF OAKLAND

No. 14341

ESTHER JOHNSON, CHESTER JOHNSON,
LOUESTER WRIGHT and GIBSON WRIGHT,
By their next Friend, ANNA EATON THOMAS,

Plaintiffs,

vs.

EDGAR F. DOWN, and the SCHOOL DISTRICT
NO. 9, ROYAL OAK TOWNSHIP, OAKLAND
COUNTY, MICHIGAN,

Defendants.

Your petitioners through their next friend, Anna Eaton Thomas, respectfully represents to this Honorable Court as follows, to-wit:

1—That they are infants and reside in School District No. 9 of Royal Oak Township, Oakland County, Michigan, and that they are of school age, to-wit: Esther Johnson, nine (9) years old, Chester Johnson, seven (7) years old, Louester Wright, eleven (11) years old and Gibson Wright ten (10) years old, respectfully, and that they reside within one block of the school building property, owned and operated by the tax payers, comprising School District No. 9, Royal Oak Township in Oakland County, Michigan, commonly known and called the Ridgewood School, and that the said Ridgewood School building is now open and being operated as a public school for the benefit of the pupils residing in the Ninth District of Royal Oak Township in Oakland County, Michigan.

2—Your petitioners further show that the said Officers and Members of School District No. 9, aided and abetted by Edgar F. Down, Superintendent of Schools of the said Ninth District, have conspired, planned, connived and agreed among themselves to prohibit certain pupils from attending the said Ridgewood School, as provided in Section Eighteen (18) of Section 5685 of the compiled law of 1915, by establishing certain imaginary marginal lines, which are so drawn, delineated and established as to prevent your petitioners who live less than two blocks from the Ridgewood School building from attending the aforesaid Ridgewood School in contravention of law, and or to-wit; Friday December 4th, A.D., 1925, your petitioners were completely and definitely ordered to attend daily sessions at the Jefferson School building, another public school owned and operated by the Citizens and tax payers of the Ninth School District of Royal Oak Township, Oakland County, Michigan, which said building is at least one and one-half (1½) miles from the Ridgewood School and the home of your petitioners.

3—Your petitioners further show, that numerous conferences have been held, consultations and individuals have interviewed the aforesaid Edgar F. Down, Superintendent of School District No. 9, Royal Oak Township, Oakland County, Michigan, in reference to your petitioners being permitted to attend the aforesaid Ridgewood School, which is less than two blocks from their home, and that in each instance prior to December 4th, A.D., 1925, the aforesaid Edgar F. Down, and the Officers and Members of School District No. 9, have been evasive, reluctant, unusual and determined in their attitude to prevent Colored pupils from attending the Ridgewood School and certain other schools, now existing and being maintained by public taxation in said Ninth School District, Royal Oak Township, Oakland County, Michigan, and that the aforesaid imaginary division lines have been drawn, schemed and planned with but one single thought, idea and purpose in mind, namely, to eliminate and prevent the attendance of Colored school children at the Ridgewood School and Jefferson School buildings.

4—That your petitioners are all of the legal school age, and have heretofore attended the Ridgewood School, and that their parents own and have physical possession of their homes, which are located within one block of the aforesaid Ridgewood School, and that there is no reasonable excuse or explanation offered, why your peti-

**916**

tioners, should not be permitted to attend the Ridgewood School as provided by law, other than the explanation given by the aforesaid School Officers, that within one month they would clear all of the school children out of the Ridgewood and Jefferson Schools, that is, they would issue, promulgate and establish certain rules, orders and edicts, removing the aforesaid Colored children from the above mentioned public school building.

5—Your petitioners further show that the said Edgar F. Down, Superintendent of Schools of Ninth School District, Royal Oak Township, Oakland County, Michigan, and the Officers of the aforesaid School District No. 9, Royal Oak Township, Oakland County, Michigan, are scheming, planning and conspiring to establish and build separate schools for Colored children in the said Ninth School District, by forcing your petitioners·who are children of tender age, arranging from to-wit: seven (7) to eleven (11) years inclusive, to walk approximately four miles per day to and from school, in order to create some excuse for establishing a portable school building in the immediate vicinity of your petitioners' homes, notwithstanding the fact, that they are less than two blocks from the aforesaid Ridgewood School, which is not overcrowded nor otherwise unsuitable for such instructions as, is provided by law in the curriculum of public schools.

6—Your petitioners further show, that they are advised by their counsel and verily believe that they are without adequate remedy in the premises, except by the aid of the Peoples Most Gracious Writ of Mandamus.

7—Your petitioners therefore pray that a Writ of Mandamus, may be issued out of, and under the Seal of this Honorable Court, directed to the said Edgar F. Down, Superintendent of Schools of School District No. 9, Royal Oak Township, Oakland County, Michigan, and to the Officers and Members of School District No. 9, Royal Oak Township, Oakland County, Michigan, command-

ing them forthwith to admit and permit your petitioners, Esther Johnson, Chester Johnson, Louester Wright and Gibson Wright, as students and pupils to the Ridgewood Public School, which is one block from their home, and they be afforded equal opportunity, instructions, teaching and accommodation as provided by law in the premises.

8—That your petitioners be granted an Order to Show Cause in the premises directed to the said Edgar F. Down, Superintendent of Schools of School District No. 9, Royal Oak Township, Oakland County, Michigan, and the Officers and Members of School District No. 9, Royal Oak Township, Oakland County, Michigan, commanding them to Show Cause to this Honorable Court, at a date therein set forth, why the petitioners should not have the relief herein prayed for, and that in the meantime and pending hearing therein, your petitioners be reinstated in the said Ridgewood School, until further order by this Honorable Court.

And your petitioners will ever pray.

> Esther Johnson,
> Chester Johnson,
> Louester Wright,
> Gibson Wright,
>
> by their next friend,
> /s/ ANNA EATON THOMAS

/s/ J. EDWARD BROWN
Attorney for Petitioners,
607 Adams Avenue, E.
Detroit, Michigan.                    (SEAL)

STATE OF MICHIGAN )
                 ) SS
COUNTY OF OAKLAND )

I, Lynn D. Allen, County Clerk for the County of Oakland, Clerk of the Circuit Court thereof, the same being a court of Record, and having a Seal, do hereby certify that the foregoing is a copy of the record now remaining in my office.

In testimony whereof, I have hereunto set my hand and affixed the Seal of said Court this 13th day of May, 1969.

LYNN D. ALLEN, Clerk-Register of Deeds.

By /s/ J. E. GEORGE
        Deputy Clerk

APPENDIX C

APPENDIX C

1-WASHINGTON
2----WILSON
3---COOLIDGE
4-ROOSEVELT
5-JEFFERSON
6---JACKSON
7----GRANT
8-----TAFT
9----LINCOLN
10---HARDING
11-----BEST

JEFFERSON ATTENDANCE AREA AS OF 1925

GRANT ATTENDANCE AREA ESTABLISHED AS OF 1926

MAP OF
SCHOOL DISTRICT
OF THE
CITY OF FERNDALE
OAKLAND COUNTY, MICHIGAN

HIGH SCHOOL

INDUSTRIAL AREA

GRANT AREA

## APPENDIX D

| Year | GRANT Cap. | GRANT Enrollment | JEFFERSON Cap. | JEFFERSON Enrollment | WASHINGTON Cap. | WASHINGTON Enrollment | TAFT Cap. | TAFT Enrollment |
|---|---|---|---|---|---|---|---|---|
| 1925 | | | 460 | 297 | 460 | 494 | | |
| 1926 | 160 | 124 | 460 | 288 | 460 | 511 | | |
| 1927 | 160 | 145 | 460 | 345 | 460 | 506 | | |
| 1928 | 160 | 134 | 460 | 299 | 460 | 336 | 800 | 651 |
| 1929 | 160 | 147 | 460 | 337 | 460 | 434 | 800 | 725 |
| 1930 | 160 | 140 | 460 | 314 | 460 | 426 | 800 | 781 |
| 1931 | 160 | 157 | 460 | 336 | 460 | 424 | 800 | 730 |
| 1932 | 160 | 177 | 460 | 323 | 460 | 409 | 800 | 726 |
| 1933 | 160 | 192 | 460 | 311 | 460 | 415 | 800 | 762 |
| 1934 | 160 | 193 | 460 | 351 | 460 | 410 | 800 | 753 |
| 1935 | 160 | 174 | 460 | 379 | 460 | 405 | 800 | 723 |
| 1936 | 160 | 185 | 460 | 383 | 460 | 366 | 800 | 717 |
| 1937 | 160 | 224 | 460 | 364 | 460 | 341 | 800 | 729 |
| 1938 | 160 | 236 | 460 | 354 | 460 | 339 | 800 | 684 |
| 1939 | 160 | 233 | 460 | 346 | 460 | 329 | 800 | 648 |
| 1940 | 160 | 225 | 460 | 340 | 460 | 318 | 800 | 688 |
| 1941 | 160 | 222 | 460 | 357 | 460 | 314 | 800 | 710 |
| 1942 | 320 | 336 | 460 | 409 | 460 | 305 | 800 | 625 |
| 1943 | 320 | 369 | 460 | 406 | 460 | 335 | 800 | 653 |
| 1944 | 320 | 415 | 460 | 418 | 460 | 342 | 800 | 634 |
| 1945 | 320 | 431 | 460 | 409 | 460 | 334 | 800 | 645 |
| 1946 | 480 | 432 | 460 | 405 | 460 | 429 | 800 | 529 |
| 1947 | 480 | 513 | 460 | 445 | 460 | 364 | 800 | 615 |
| 1948 | 480 | 587 | 460 | 535 | 460 | 364 | 800 | 682 |
| 1949 | 480 | 600 | 460 | 430 | 460 | 370 | 800 | 812 |
| 1950 | 480 | 670 | 580 [1] | 493 | 460 | 350 | 800 | 782 |
| 1951 | Un-known [3] | 710 | 580 | 540 | 460 | 363 | 800 | 792 |
| 1952 | " [3] | 681 | 580 | 580 | 460 | 375 | 800 | 832 |
| 1953 | 600 [2] | 708 | 580 | 641 | 460 | 376 | 800 | 814 |
| 1954 | 600 | 660 | 580 | 606 | 490 | 390 | 800 | 796 |
| 1955 | 600 | 648 | 580 | 556 | 490 | 358 | 800 | 812 |

[1] HEW Hearing Examiner found capacity of Jefferson was 580 to 640 through 1955.

[2] HEW Hearing Examiner found capacity of Grant was 600 to 800 from 1953 on.

[3] Evidence was conflicting according to Hearing Examiner.  App. p. 1766.